304 So.2d 17

John O. BROWN

v.

STATE.

I Div. 471.

Court of Criminal Appeals of Alabama.

Aug. 13, 1974.

Rehearing Denied Oct. 1, 1974.

William J. Baxley, Atty. Gen., and James W. Webb, Special Asst. Atty. Gen., for the State.

R. Edward Massey, Jr., Mobile, for appellant.

HARRIS, Judge.

Appellant stands convicted of murder in the first degree and is now serving a life sentence in the penitentiary. Both at arraignment and trial, he was represented by retained counsel. He pleaded not guilty. After conviction he was found to be indigent and a free transcript of the evidence

was furnished him. Trial counsel represents him on appeal.

In the early morning hours of May 22, 1973, two men and a seventeen-year-old girl robbed a service station on the causeway in Baldwin County. The station operator was killed with a shotgun blast from a .410 double barrel sawed-off shotgun using number four bird shot. The investigation led to the arrest of appellant, Mike Pardue and Teresa Lanier and they were separately indicted for murder in the first degree. Pardue was tried first and got a life sentence and then appellant was tried. At this time we do not know if Teresa has been tried. We do know she testified for the state against both men.

We take the following statement of the facts from the state's brief and here note that appellant adopts these facts by reference in his brief:

"Nelson E. Grubbs, State Toxicologist, testified that he performed an autopsy on the body of the deceased, Ronald Rider, May 22, 1973, at Mack's Funeral Home in Robertsdale. He testified Deputy Sheriff Stewart of Baldwin County was present at the time. The autopsy was performed about 1:30 p.m. The cause of death was a gun shot wound in the brain. The shot was number four 'bird shot'. Witness identified and examined a 410 shot gun delivered by Deputy Travis and Chief Pridgeon of Saraland. He also examined a rag and fibers in the shot gun and found the rag to have powder burns and to be the same as that used on the shot gun. The rage was taken from the Defendant's automobile. Mr. Grubbs also examined similar dirt and bits of clam shell removed from around Thoni's Service Station and from the automobile identified as the Defendant's.

"On cross examination Dr. Grubbs stated that the mat of the automobile examined and the juke fibers were exactly similar to those juke fibers found on the gun. He could not say, however, that the mat could not be another, but did say the imprint on the rag taken from the automobile was exact and a positive identification of the imprint left by the gun from the sawed off portion of the barrel. The witness stated he found no finger prints on the gun. It had been well oiled and greased. Grease was on the rag. No mud or shell were found on the clothes or shoes of the Defendant, but he stated that the Defendant's clothes were not examined until June 7, and at that time had been cleaned and packed in a suitcase.

"A. D. Long, a Deputy Sheriff, Baldwin County, testified that he went to Thoni's Service Station at 2:30 A.M. on May 22, 1973. At that place he found the body of a person known to him to be Ronald Rider. The body was on the station floor. The witness described the safe and other items in and around the building and the position of the body. He further stated that Thoni's Service Station was located in Baldwin County, Alabama.

"Robert Stewart, a Deputy of Baldwin County, testified that he went to Thoni's Service Station in Baldwin County on May 22, 1973, where he found the body of a man known to him to be Ronald Rider. He identified a photograph of the body and the scene. He stated that he went to a Funeral Home in Robertsdale for the autopsy. He also picked up a crow bar, samples of dirt, and clam shells from around the death scene, and took these to Dr. Grubbs for examination. Witness also stated that the Defendant made a statement before him on Tuesday, May 29, 1973, at approximately 3:40 p.m., which was taped. The tape was played for the benefit of the Jury and introduced into evidence. The shot gun was also introduced as State's Exhibit No. 6.

"Teresa Lanier, a co-Defendant, testified that she and Mike Pardue went to the Defendant's motel room in Saraland on

Monday which may have been May 22, 1973, about 8:30 p.m. The three went riding in the Defendant's station wagon, stole two tires for Mike's car which didn't fit. Mike stole a green truck. Later the witness and Mike left, after Mike tried to get the Defendant to go with them, and the Defendant refused. They stopped at Mike's grandmother's house where Mike got a shot gun from a tree. The gun was identified by the witness as State's Exhibit No. 6. From there they drove around the State docks and then went out on the Causeway, where they met the Defendant at a place called Argrio's. The witness and Mike got into the Defendant's car and discussed robbing Thoni's Service Station. The witness and Mike went in the green truck and the Defendant drove in front of them to Thoni's where the Defendant drove up to the pumps. The Defendant and the station attendant (deceased) were looking under the hood of his car when Mike came up and stuck up the service station attendant with the gun. All went into the station. The Defendant took car keys from the attendant and Mike handed the Defendant the shot gun and told him to watch him. The safe was the type money went into a hole on top and it was locked and the attendant professed not to have a key. The Defendant went first to his car and got a crow bar and told the attendant to open the safe. The attendant was in the process of beating on the safe when he started to hit the Defendant with the crow bar. Then the Defendant shot him. The Defendant cried and dropped the gun. Mike picked it up and they all ran. They went back to the motel where the gun was cleaned and put under the driver's seat in the Defendant's car. The Defendant took the other two home. The witness stated she had never given a taped or written statement.

"Frank Mann, Saraland Police Department, identified the picture of the Defendant's car and stated he was present when Dr. Grubbs examined the automobile.

"The Defendant testified in his own behalf that on or about Monday, May 21, 1973, Mike Pardue came to his motel with a flat tire about 5:30 p.m. The Defendant gave him a ride home and went about trying to find a spare tire. Later Mike and Teresa came to the room about 8:30 p.m. They wanted the Defendant to accompany them to the State docks to find the car that Teresa had some clothes and grass in. Mike told the Defendant that he had killed three people. Mike and Teresa finally left about 1:15 a.m. The Defendant lay down on his bed. They came back and woke him up about 3:15 a.m. and told him about stealing a Volkswagen. The Defendant and Teresa went to sleep on Defendant's bed about 4 a.m. and Mike Pardue left. About 8 a.m. the following morning Mike woke the Defendant up and he took them home. He stated he was picked up by the Saraland police on Tuesday evening, May 22.

"The Defendant's mother, aunt, halfbrother, stepfather, sister-in-law, wife, and a neighbor testified to his good character."

The statement of appellant on the tape played to the jury is as follows:

"Q. How about stating your full name for me?

"A. John Oscar Brown.

"Q. How old are you, John?

"A. 21.

"Q. Do you understand what you have been charged with?

"A. Robbery.

"Q. You understand that you've been charged with murder and robbery?

"A. Yes, sir.

"Q. At a station in Baldwin County at the Thoni Oil Station?

"A. Yes, sir.

"Q. O.K. and at this time there is nobody but myself Deputy Robert Stewart, an investigator from Baldwin County, and Bill Travis, an investigator from the Sheriff's Office in Mobile County, and yourself in the room, is that right?

"A. Yes, sir.

"Q. None of us is in uniform and none of us has a visible weapon?

"A. Yes, sir. I reckon.

"Q. O.K., do you understand that you have the right to remain silent and say nothing if you desire?

"A. Yes, sir.

"Q. Anything you do say can and will be used against you in a court of law?

"A. Yes, sir.

"Q. Before you answer any questions, you have the right to talk to a lawyer and have him present with you while you are being questioned. Do you understand that?

"A. Yes, sir.

"Q. That if you cannot afford to hire a lawyer, one will be appointed to represent you before any questions, if you so desire. Do you understand that?

"A. Yes, sir.

"Q. Should you decide to answer questions, whether with or without an attorney present, you may stop answering questions at any time you desire, do you understand that?

"A. Yes, sir.

"Q. Alright, do you understand each of the rights that I've read to you?

"A. Yes, sir.

"Q. Would you like any of them read or explained again?

"A. No, sir, I think I understand them.

"Q. Having these rights read to you and thoroughly understanding each individually and collectively, do you wish to answer questions concerning this matter?

"A. Yes, sir, as much as I can remember.

"Q. O.K., John, how about let's start off the first time if you tell us just what happened on the night we are speaking of which was, I believe, Monday night, the 20——let's see—we're talking about Monday night, May the 21st.

"A. Yes, sir.

"Q. How about telling me what happened that night in reference to you meeting some folks and just start from—I tell you what, just start from the time when the three of ya'll met at your motel, you, Monkey, and Teresa, and tell us just what happened from there on through.

"A. Well, it was about 8:00, maybe 8, somewhere in that presence of 8 and maybe 8:30. Teresa and Monkey come up with her sister in their car, and they come in, and somebody had stole my radio and I was mad, so they come on in for a few minutes, and we left and I wanted to go to see did John Luker steal my radio. So we got down there and Monkey had left his car that morning, well about 5:00 there at my motel. He had a flat. And whenever we was out hunting my radio, I asked John and David about it, and they didn't know nothing. We, I went to Mr. Hanstain's and got Monkey a spare tire, which is, I reckon, still in my Falcon. And then we went over towards J.B.'s and then Monkey stole a gray pointed (Hornet) type crow bar out of a car. I believe it was, pretty sure it was a bluish Malibu, I believe, there at the Kayo Station at Eight Mile. Then we went back to my room and I got my guitar and sung and played a little bit and Teresa said she liked my playing, so then Monkey and Teresa started talking about stealing a car, so Monkey had also, I'll put this in, while they was talking about stealing a car, Monkey said that, somehow it come up, that Monkey made the statement that he had killed three times

before and that he'd do it again. They was talking about that they had to get up some money, that both of them was broke, and they needed some money. So then Monkey went over to Hous Brothers' Garage and, I believe, I wasn't with them, and stole a green Chevrolet truck, then they come back. Well, they had left and Monkey said, 'Are you going?', and I said, 'No, I don't know about it, I don't want to go.' And Monkey said, 'Well, if you are going, let me know' cause they were supposed to been going to get Teresa's car. So they left, then they come back, I believe in a time around 10 if I'm not wrong. I really don't know what time it was. And Monkey said they rode over towards the causeway, and they had stole a Volkswagon, and this Volkswagon was red and had a bulldog on the front towards the windshield, and he said, 'John, I know where we could make some cool money, if you want to make it.' And I said, 'How's that? What have you stole?', and he said, 'We haven't stole nothing.' He said, 'I know where a service station is that ought to be easy to rob.' I said, 'Service station to rob?' and he said, 'Yeah' and I said, 'Man, I ain't never done nothing like that.' He said, 'There's nothing to it. I got my gun, so we can just scare the hell out of the man, and won't know nothing.' So Teresa and Monkey, well, he told me to follow them over there. So Teresa and Monkey got in the Volkswagon, then I followed him in my car. So we pulled up towards this station, and there was a trailer sort of offset from the station. I pulled in first—Monkey and Teresa done like this to me to pull in first and I pulled in, turned around, and headed towards out and then Monkey done so and the plan was for Teresa to act like she was out of gas and something of that nature, so she walked up there and me and Monkey come around back of the trailer. Monkey was toting a crow bar and the gun, too, and come around back to the trailer and back to the service station and was stopped, then when Teresa was talking to him, Monkey walked up with the gun and said, 'Put your hands up.' The man looked around and sorta put his hands out like this and didn't move, so I had been sniffing gas, and really didn't think about what I was doing, so I tried to the left of the doorway there, I tried to get open the safe and I was awfully scared cause I never done nothing of this type before, and then Teresa went out towards this man's car and trunk, I can't,—the man walked towards outside and seem like Monkey had opened up the trunk. So then the man looked like he started to move, and Monkey said, 'Don't you move, you —— —— —— —— —— ——, you.' And then I was trying to pry the thing open and was scared. I was wanting to run cause believe me I've never done nothing like this before. Then Teresa was out there and she said, 'Hey, Monkey, here is a tire that will fit your car', and Monkey hollared back at her and said, 'You crazy —— —— ——, that won't fit my car.' So then she come towards the station and then I was looking towards the outside and then I kind of looked down towards the ground and it really began to dawn on me what I had got myself into and what I was doing. The man said, 'You can take anything you want, but please don't shoot me. You ain't going to shoot me, are you?' And Monkey said, '—— ——' and shot him. And then when I heard the blast, I never did look at the man, cause I've never seen nobody killed before, and I run out and Monkey run out and before Monkey shot him, Teresa said, 'Where's the keys?' and he give Teresa the keys, then I believe they took some odd dollars off the man—he dumped it out and give it to her. Then when the blast went off, it scared me so bad that I run out and I don't remember how the man fell or anything. I didn't want to look. I never been with nobody that shot anybody before. We run out and Teresa run towards the man's car and said, 'Why don't you put his body in here', and Monkey said, 'No, no, no, let's get the hell out of here', and slammed the trunk down. So then we went back over towards our cars and I remember my car, I was having bat-

tery cable trouble sometimes it didn't want to crank and I told Monkey to wait a minute to make sure my car would crank. So then I got in my car and cranked it and Monkey got in their's, then he left out and I left out. Then we got back over towards the point there in Prichard and Teresa pointed over towards, no Monkey done like this with his left arm and pointed over towards the side and Teresa got in the car, and me and her went back to the room. Monkey followed us to Saraland, and Monkey was supposed to have hid the car, I don't know where. So then it was about 3:15 maybe something to four. Monkey told me if I ever told anybody what had took place that he would see that my mother and father would be shot, and he said, 'John, I know you've got a little girl that you love dearly.' And he said that I've got connections and I will see your little girl's head blew off. I remember I started to cry.

"Q. Let's back up just a little bit now, John. Back up to the service station, do you remember if the boy was inside or the outside of the building when he was shot or if he had been shot outside and run inside, what the deal was there?

"A. I believe he was more or less inside the service station, and then like I said he threatened my little girl and they sat down there and started counting out the money. I believe there was 30 to 40 dollars. It was in a cigar box, so then, I was panicky.

"Q. Was there anything in the cigar box other than the money?

"A. No, sir, there was receipts, pieces of cigarette boxes and there was two checks.

"Q. Anything else—a bank bag or anything?

"A. Yes, sir, there was a bank bag.

"Q. Do you remember what color it was or what bank it was on?

"A. It was sorta of a whitish bank bag, but I don't remember seeing no writing on

it. Then him and Teresa got to talking so he took the cigar box and put it in my top drawer there with my things and Teresa made the statement that if we're going to leave town, we're going to need more money than this, so they decided that they was going to go and rob the Triple A Station.

"Q. Let's go back to the station there just a minute, John. Who got the car keys first? Talking about the car keys to the victim's trunk.

"A. To the man that was shot?

"Q. Yes.

"A. Teresa.

"Q. Now, who is Teresa?

"A. This's the girl what was with us.

"Q. Do you know what her last name is?

"A. Teresa Lanier.

"Q. How did Teresa get the car keys?

"A. Out of his pocket.

"Q. Did she, herself, get them out of his pocket?

"A. Yes, sir. Well, she said, 'Where is your car keys?', and he said, 'They're in my pocket.', and he started to reach down, and Monkey said, 'Put your hand up.'

"Q. What kind of gun did Monkey have?

"A. A .410 double barrel shotgun. That's what I believe it was.

"Q. Alright, a .410 double barrel shotgun.

"A. Yes, sir, I never did not really look at the gun.

"Q. Was there anything in particular about this shotgun that you remember?

"A. It was sawed off, I believe it had two triggers and a thing up towards the top.

"Q. I'm going to show you a picture of a gun and I want you to tell me if this is the gun that you're talking about.

"A.   Yes, sir, it is.

"Q.   That gun right there is the gun that you speak of Monkey having?

"A.   Yes, sir.

"Q.   Who is Monkey?

"A.   Mike Pardue.

"Q.   Mike Pardue and his nickname is Monkey.

"A.   Yes, sir.

"Q.   Okay, and you say that that is the gun that we've got the photograph of?

"A.   Yes, sir.

"Q.   Alright, what did you do with the gun after this whole thing was over with?

"A.   You want me to finish out the tape or tell you now?

"Q.   No, let's just tell me what you done with the gun when ya'll got through with it.

"A.   Well, that morning after they robbed the Triple A Station they come back to the room and they sorted everything out and give me $15.00.   Then we went to Shell Beach Road and come to 45, then went to this other road, I believe it was Deer Fork, I ain't for sure.   It goes down around a curve and there's this house there at the curve with a fence, I believe it had a fence, and Monkey took the gun back up there and was supposed to put it back inside or put it on the front porch or something of that nature, then I took them—

"Q.   Wait a minute now, at the house, did you see anybody at the house you went to?

"A.   Yes, sir, there was a woman around back.

"Q.   Did Monkey go in the house?

"A.   I really can't say cause when he went up there, I started on my way down.

"Q.   Did you just leave him there?

"A.   Well, I thought that woman was going to catch him.

"Q.   Well, did you leave him or did you come back and get him?

"A.   No, sir, he come back to the car and we went straight.

"Q.   Alright, do you know what went with the checks you were talking about that was in the cigar box?

"A.   Teresa, I believe, took them, no Monkey put those in his pocket.

"Q.   Monkey put the checks in his pocket.

"A.   Yes, sir.

"Q.   What went with the cigar box?

"A.   When I went to get my clothes, I, the cigar box there was in my suitcase then.   Then I had to give the man my car cause I owed him some money and he kind of wanted me out after everything had happened, law had come up there and everything.   So when this lady helped me and give me a ride by my mama's, I went to my mother's house and then whenever I was going to straighten up my suitcase and I went around back and put it in the garbage can.

"Q.   At the motel?

"A.   No, at my mother's house.

"Q.   At your mother's house?

"A.   Yes, sir.

"Q.   Is she on city garbage pick-up?

"A.   I believe so.

"Q.   You don't know how often the garbage truck runs out there?

"A.   No, sir, I do not.

"Q.   What did ya'll do with the shells that were left over from the shotgun.

"A.   Monkey had those on him, I don't know what he done with them.

"Q.   What did he do with the empty shells?

"A.   He still had them on him.

"Q. You never did know what he done with the empty ones or the good ones?

"A. No, sir, I do not."

On the same morning of the causeway robbery and killing, another robbery and killing occurred at the Triple A Service Station in Saraland in Mobile County. Pardue was arrested by the Saraland Police Department in connection with this crime. An intensive and extensive investigation of both crimes was undertaken by the law officers in Baldwin and Mobile Counties. In putting together bits of information gathered from time to time, suspicion began to focus on the trio involved in the causeway robbery and murder. Appellant and Teresa were picked up for interrogation and interviewed several times. In the beginning, appellant's statements were exculpatory in nature but the information he gave the officers definitely involved Pardue. Finally, the officers brought Pardue to the interrogation room to confront appellant. Pardue fingered appellant as the killer in the causeway robbery. Appellant was transferred from the Saraland jail to the Baldwin County jail on Saturday, May 26, 1973. The Baldwin County officers did not question him until the following Monday and then only after giving him the *Miranda* warnings. As a matter of fact, the Chief of the Saraland Police Department testified that before any interview was had with appellant, he was given the *Miranda* warnings. He expressed it this way, "Every time we opened our mouths, we advised him of his constitutional rights."

Appellant was indicted on July 10, 1973, arraigned on July 23, 1973, and the case was set for trial on August 14th. A motion for determination of competency to stand trial was filed on July 30, 1973. This motion was granted on August 8th and the case was continued.

On August 24, 1973, the report of the psychiatric team at The Searcy Hospital was filed by the Superintendent with the Circuit Judge. The report states, in pertinent part:

"At the time of admission, Mr. Brown was rational, cooperative, although somewhat anxious. He did not display any bizaar or abnormal behavior. Mr. Brown was considered competent.

\*    \*    \*    \*    \*    \*

"It was noted by the treatment team that Mr. Brown's depression was a result of incarceration. However, the depression is such that treatment and/or hospitalization is not indicated at this time. It is recommended that he be given a speedy trial."

Appellant was rearraigned on October 25, 1973, and the case was set for trial on November 5th, and got underway on the 7th.

On July 30, 1973, appellant filed with the Clerk of the Circuit Court of Baldwin County a motion to suppress statements and a "scattergun" motion to produce. The motion docket had already been set for August 1, 1973, and it was too late to prepare another calendar and notify counsel by mail. The clerk's office called counsel's office and left word with a secretary that these motions would be heard on August 1st. Counsel failed to show and present the motions. These motions were called to the court's attention for the first time on the day the case was set for trial and there was quite a colloquy between the judge and counsel concerning their dilatoriness with reference to these motions.

A full hearing was had on appellant's motion to suppress, and on his demand for all statements made by appellant to the officers of the Saraland Police Department and the Sheriff's Department of Baldwin County. The District Attorney had given counsel a copy of the statement taken by the Sheriff's deputies, and told the court that was the only statement he ever had or had seen. After hearing testimony, pro and con, and arguments of counsel on the motion to suppress which covers 150 pages

of the transcript, the trial court ordered copies of all statements taken by the police officers of Saraland, as well as the tape taken by the Sheriff's Department, be turned over to counsel for appellant and this was done.

The tape of the interview with appellant made by the Sheriff's deputies, after it was transcribed, was placed in a locked drawer in the Sheriff's Office. The deputy who took the tape and the sheriff were the only people who had a key to this drawer. This tape was produced and turned over to appellant's counsel to play and compare with the transcription furnished by this District Attorney to counsel, and the hearing was interrupted for this purpose.

During the hearing on the motion to suppress it was brought out on cross-examination of a detective from the Sheriff's Office in Mobile that he interrogated appellant on the afternoon that appellant made the inculpatory statement and that he had a difficulty with him. He testified that he slapped appellant after appellant knocked his glasses off bending the frames, kicking him on the shin, and knocking his chair over. After this occurrence, the detective ended the interrogation and opened the office door to leave, at which point appellant would have been sent back to jail. Thereupon the appellant said, "Don't take me back; I acted a fool; I'm in enough trouble." Subsequently the tape was made by Deputy Stewart of Baldwin County.

In our judgment prudent police work would have been best served if there had been no further interrogation of appellant that day or until such time as the psychological residual stress, stemming from the incident, *if any,* had been completely dissipated. The trial judge heard the testimony in detail surrounding this incident and determined that appellant's confession was freely and voluntarily made. This was the duty devolving upon him and he saw, heard, and observed the demeanor of all witnesses and was in a better position to make this determination than we on the cold record before us.

We hold the proper predicate was laid as to the voluntariness of the confession before the tape was played to the jury. This procedure fully complied with the requirements spelled out in Boulden v. State, 278 Ala. 437, 179 So.2d 20; Flannagin v. State, 289 Ala. 177, 266 So.2d 643, and a host of other cases.

■ Appellant made a motion to continue this case until all statements made by appellant were produced. The court denied the motion but ordered and obtained all statements, whether exculpatory or inculpatory, and they were given to counsel for inspection and use in the trial of the case. The court did not abuse its discretion in overruling this motion. Wade v. State, 49 Ala.App. 601, 274 So.2d 626; Boswell v. State, 290 Ala. 349, 276 So.2d 592.

■ The trial of this case covered three days. During the first two days the district attorney, counsel for appellant, and appellant all agreed to the separation of the jury at lunch time and overnight. This agreement was made in the absence of the jury. At the end of the second trial day, the court asked appellant's counsel the following question:

"THE COURT: Have you discussed with your client the feasibility of releasing this jury from the rules that require that they be kept together at night?

"MR. CLAY: Yes."

Thereupon the following occurred:

"THE COURT: I want to explain to Mr. Brown, and I understand the claim you have about his education, and I don't want any doubt that he understands— Under the law as the Court interpretes it, this jury, unless you and your Attorneys consent, has to be kept together. I have asked your Attorneys to talk to you about releasing us from this rule, consenting to let them go home with the instructions that they not look at tv, nor

look at newspapers or discuss it; I don't want you to feel it will make any difference in my charge whether you agree to it—it would save the County—really, we don't have facilities in Bay Minette for sequestering mixed juries.

"MR. CLAY: I realize that and I have no objection, and I talked to him and the defendant has no objection. I would have to object to the Court's statement while the jury was in here—if I had known it I would have said something prior. I would object to the fact that the Court stated while the jury was in the Court room, to the defense counsel, in the presence of the jury and the defendant and asked us if we would talk to the defendant and ask him if he would agree to letting the jury separate and go home, and this was stated prior to the jury adjourning and going out of the Court room and I would have to object to that.

"THE COURT: Will you agree that the record show that a few—within a few seconds after that I realized that the jury was here and didn't want to appear to be putting compulsion on the man, and the jury was removed from the room?

"MR. CLAY: I agree with that, but I feel that I should object.

"THE COURT: I should have gotten them out before I asked.

"MR. CLAY: I feel like it might put it on the minds—

"THE COURT: Is it all right with you, John? (indicating defendant) I don't want to let them go if it is not all right with you?

"DEFENDANT: Yes sir.

"MR. HENDRIX: It is all right with the State too. I understand the State has to agree too.

    \*     \*     \*     \*     \*     \*

"REPORTER'S NOTE: The Jury is returned to the Court room.

"THE COURT: Ladies and Gentlemen of the Jury. I want you to pay close attention to the instructions that I am about to give you. Under the law in this type case, after the jury is once chosen, it has to stay together until the conclusion of the case, but due to the our jury here is a little more than equal—women and men and facilities for sequestering 12 people and two bailiffs are limited and with the consent of the defendant and his Attorneys and Mr. Hendrix on behalf of the State, it has been agreed that we could let you go home tonight. I want to remind you that those people who are married, I know the first thing your spouses are going to want to know: 'What went on' and you just tell them the law prohibits you discussing it with them or anybody else. If two of you ride home together tonight it will be difficult, but don't discuss the case, but make up your mind not to discuss the case; I told you that is the law and you will abide by the law as you swore to do Monday. It is all right to watch TV or listen to the radio or read the newspaper, but if you come to a story about this case, don't listen, look or read it in the paper. Don't let anybody else, of course, approach you to talk to you about the case and if they do, you report them to this court. Be back here at 9:00 o'clock in the morning."

At the time the court asked counsel for each side and appellant himself if they agreed to the separation of the jury, he did not realize the jury was present. Even though counsel for appellant stated to the court he had no objection to the separation and that he had talked to appellant and he had no objection, counsel did object *but he did not move for a mistrial.* We do not feel that reversible error intervened here. This was an oversight on the part of the trial judge and we deem it was harmless error. Kenny v. State, 51 Ala.App. 35, 282 So.2d 387.

The refused charges were either affirmative in nature, incorrect statements of the

applicable law, argumentative under the evidence, or were fully and substantially covered in the oral charge or in other given charges. Prince v. State, 50 Ala.App. 368, 279 So.2d 539.

■ Teresa Lanier's testimony was strongly corroborated by extrinsic evidence directly connecting appellant with the crime for which he was convicted. She testified that on the night of the robbery and homicide, appellant was driving a 1962 Ford Falcon Station Wagon and that he shot the victim with a .410 sawed-off shotgun, and she identified photographs of both the station wagon and the gun and these photographs were introduced in evidence. The investigating officers found the gun and it was identified and introduced in evidence. The day after the homicide, appellant sold the station wagon to the owner of the Plantation Motel where he had been living for several weeks in satisfaction of his debt to the motel. A copy of the bill of sale was properly identified and introduced in evidence. The corroborating evidence precisely met the applicable law. Slayton v. State, 234 Ala. 9, 173 So. 645; Moore v. State, 30 Ala.App. 304, 5 So.2d 644; Dailey v. State, 233 Ala. 384, 171 So. 729; Cameron v. State, 49 Ala.App. 482, 273 So.2d 242.

This was one of the most heinous and savage murders committed in this state in a long time, evidencing a depraved mind and a cold stone heart. The court accorded appellant a fair and impartial trial conforming to due process and his constitutional rights in the highest sense. The court charged the jury on the four degrees of homicide embraced in the indictment. This was far more than he was entitled to. Appellant was either guilty of murder or he was not guilty of anything.

Affirmed.

ALMON, TYSON and DeCARLO, JJ., concur.

CATES, P. J., not sitting.