304 So.2d 249

**Eugene LYKES**

v.

**STATE.**

**3 Div. 246.**

Court of Criminal Appeals of Alabama.

Nov. 26, 1974.

———◆———

No brief for appellant.

William J. Baxley, Atty. Gen., and Joseph G. L. Marston III, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Lykes was convicted of rape and sentenced to ten years imprisonment in the penitentiary. At arraignment and trial he was represented by retained counsel. He pleaded not guilty. At the time of sentencing he gave notice of appeal and requested suspension of sentence pending appeal. Bond was fixed at ten thousand dollars and it was made and approved. He is not indigent. He is not represented by counsel on appeal.

This is another case involving a black man and a white woman. The accused did not testify and offered no testimony in his behalf. The rape occurred on April 16, 1973, shortly after midnight.

The victim lived in the Marbury Community of Autauga County with her husband and three children under seven years of age. Her husband was employed in Montgomery. His hours of employment were from 3:00 P.M. until 3:00 A.M., but he did not leave for work until 5:00 P.M. on the day in question. She fed and put the children to bed around eight o'clock. She washed the dishes, including a butcher or carving knife, and left them on the drain. She then retired for the night. She locked the doors but only pulled the windows down.

Shortly after twelve o'clock she was awakened by a hand on her shoulder. There was enough light in the room for her to see a black man's face and the blade of a knife in his hand. She reached for a flashlight at the head of her bed and the

man said, "Uh-uh—I'll kill you." She said, "What do you want?" He replied, "All I want to do is go to bed with you." She started crying, and said, "Oh, God, no."

Her testimony runs: "Well, after he said he wanted to go to bed with me, and I set in to crying and saying, 'Oh, God, no', he said, 'I won't hurt you.' He said, 'All I want to do is go to bed with you', and I asked him about my kids, and he said, 'I haven't hurt your babies, and I will not hurt your babies just as long as you do what I tell you', and he says, 'What time will your old man be home', and I says, 'Well, I have no idea. He comes in any time of the night', and he says, 'Well, I'll make it quick.' Well, he told me to move over, and I wouldn't, and he pushed me, and told me to get over. Well, when it was over, he just got off the bed, and started—pulled the cover down, and said he was gonna (sic) to leave, and he tried, he was trying to kiss me, and I kept turning my head, and so he told me he—I kept crying, and he kept telling me to hush crying, that I was gonna wake the kids—not to make him do anything, and when he started to leave, he said, 'You can check your kids. I haven't hurt 'em.' Said, 'You can get up and check 'em after I leave.' And so when he left the bedroom, I thought he was leaving. He said, 'I'm gonna leave, now,' and I thought he was gone. Well, I was fixing to get out of bed and I heard footsteps coming back toward the bedroom. Well, when he came back in, he asked me if I was nervous, and I said, only for my kids', and he said, 'I haven't hurt your kids', and he said, 'I'm not going to.' He said, 'You don't know me. You've never seen me,' and I said, 'No', and he said, 'You're pretty good. Better than some. See you around.' He asked me if I wanted him to let the window down when he went out. I told him, 'No, if the window had been locked, he wouldn't have got in,' and so he turned and left." All of this took place in ten to fifteen minutes.

The victim checked her children and found they had not been hurt or disturbed.

Her husband had gone to work in the car and she could not leave the house until he came home. She sat on the side of the bed for about two hours waiting on her husband. When he came they carried the children to a kinsman and the sheriff was called. When the officers arrived, the victim related to them the terrible and revolting ordeal that she had been forced to suffer. She gave them a description of her assailant as best she could under the circumstances. She told them that when he entered her bedroom he was nude; that he was fairly tall, slim, had bushy sideburns, a goatee, and that he was fairly young. She estimated his age at under twenty. She was positive about the bushy sideburns and goatee as she felt them on her face when he was trying to kiss her.

Her husband drove her to see a doctor in Clanton, whom made a vaginal examination and found male semen in her vagina. The doctor was unable to come to the trial, but it was stipulated by counsel for both sides that if he were present he would testify that he found no injuries in the pelvic area but he did find male semen in the victim.

The officers instigated an intensive manhunt for the rapist. They interviewed about 80 percent of the young black males in the Marbury Community and in the Verbena area in Chilton County. Their investigation focused on appellant and a 17-year-old youth by the name of Larry Smith.

The officers learned that appellant was a highschool dropout who lived with his mother in a house trailer within the curtilage of a big house occupied by his grandmother and some other occupants in the Verbena Community. It was learned that when his mother was out of town, appellant slept in one of the bedrooms in his grandmother's house. The officers learned that appellant's mother was visiting her daughter in New Orleans at the time this offense was committed. The officers went before a magistrate in Clanton and procured a search warrant for the house and trailer. They went to appellant's grand-

mother's house and showed her the search warrant and told her they wanted to search the room used by appellant when his mother was out of town. The grandmother carried the officers to that bedroom and they saw a butcher or carving knife lying on the dresser and they took it with them. They did not search any other rooms in the house nor did they search the trailer. At trial the victim identified the knife as being the one that she left on the drain the night she was raped and which was missing the next morning. The knife was admitted in evidence.

Appellant and Larry Smith were arrested less than 72 hours after the offense and carried to the Autauga County jail. Before appellant was interrogated, he was given the *Miranda* rights and warnings and he signed a waiver of rights form which is now a standard form waiving his right to counsel. He declined to make a statement at that time.

The victim was brought to the sheriff's office and put in a room adjacent to the room where appellant was with several officers. There were louvers in the door where appellant was being interrogated. The victim could not see appellant but she could hear the questions the officers asked and appellant's responses loud and clear. The officers had a tape recorder and appellant was asked if he raped the woman who lived in the house identified as the victim's. He denied the rape but did state that he was familiar with the house as his mother had worked there at one time and he had helped her on occasions by mopping the floors. The officer asked him to repeat certain sentences or statements after the officer. The officer repeated the same statements that the victim said the rapist made to her before, during and after the offense and appellant complied. After the interview, the sheriff entered the office where the victim was seated and asked her if she recognized appellant's voice and she positively identified him as the man who had raped her.

Larry Smith was brought to the room where appellant had just been interviewed and the identical procedure was followed using the same language that the rapist said to the victim. At the conclusion of this interview, the sheriff re-entered the room where the victim was still seated and asked her if she recognized the voice of the second man and she said that she did not, that this was not the man—that the first voice was the man.

A line-up was conducted with six men and appellant was in the line-up. A photograph of the men in the line-up was made and shown the victim. She picked appellant out of the line-up as her assailant.

In addition to this the victim made a positive in-court identification pointing to appellant.

■ The butcher or carving knife belonging to the victim and found in the bedroom occupied by appellant was properly admitted in evidence. It was corroborative of the victim's testimony and connected appellant with the crime. Dailey v. State, 233 Ala. 384, 171 So. 729.

At trial the tape recordings of both appellant and Larry Smith were played to the jury at the request of appellant.

When the state rested, appellant made a motion to exclude the state's evidence. The motion was overruled. Appellant also requested the affirmative charge in writing and these charges were refused.

■ Tape recordings of conversations with persons accused of crimes and played to the jury have been many times approved by the appellate court of this Country. Boulden v. State, 278 Ala. 437, 179 So.2d 20; Flannagin v. State, 289 Ala. 177, 266 So.2d 643; Brown v. State, 53 Ala.App. 674, 304 So.2d 17, Ms. August 13, 1974.

The use of a magnetic tape recording for "voice identification" has long been approved if adequate safeguards are followed to insure its accuracy and authenticity.

Fikes v. State, 263 Ala. 89, 81 So.2d 303; Wright v. State, 38 Ala.App. 64, 79 So.2d 66.

In *Fikes,* supra, the Court said:

"It seems to be a well settled principle that a magnetic tape recording may be used as evidence when it is of matters otherwise legal, and provided the proper safeguards are shown to have been used so as to protect the recording against error or spoliation. The speakers as recorded should be properly identified and adequate safeguards taken to insure authenticity. Wright v. State, 38 Ala. App. 64, 79 So.2d 66; Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L. Ed. 1322; United States v. Schanerman, 3 Cir., 150 F.2d 941(6); State v. Perkins, 355 Mo. 851, 198 S.W.2d 704, 168 A.L.R. 920, annotation 927; Ray v. State, 213 Miss. 650, 57 So.2d 469; Williams v. State, 93 Okl.Cr. 260, 226 P.2d 989."

 The tape recording was played outside the presence of the jury the night before it was played to the jury the next day. Counsel for appellant was present and determined the recording was clear and audible and counsel insisted that it be played to the jury. This procedure fully squares with the guidelines spelled out in *Wright,* supra.

The trial court, at the request of appellant, gave 20 written charges to the jury, and refused 2 charges which were affirmative in nature.

Appellant was represented in the court below by Hon. Arthur Parker and Hon. J. Louis Wilkinson, two of Alabama's most outstanding trial lawyers. These lawyers protected appellant's constitutional rights at every stage of the proceedings. This was one of the most aggravated rape cases imaginable and the fact that the jury fixed the punishment at only ten years imprisonment must be due to the resourcefulness, ingenuity, and power of persuasion of these astute lawyers.

Appellant had his day in court and that is all he was and is entitled to. The case is affirmed.

Affirmed.

ALMON, TYSON and DeCARLO, JJ., concur.

CATES, P. J., dissents.