312 So.2d 31

**Roscoe C. HIGGINBOTHAM**

**v.**

**STATE.**

**3 Div. 309.**

Court of Criminal Appeals of Alabama.

March 4, 1975.

Rehearing Denied April 1, 1975.

George K. Williams, Huntsville, for appellant.

**634**

William J. Baxley, Atty. Gen., and Sarah M. Greenhaw, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Omitting the formal parts, the indictment upon which appellant was put to trial is as follows:

"The Grand Jury of said county charge that before the finding of this indictment Roscoe C. Higginbotham, whose name is to the Grand Jury otherwise unknown, feloniously took and carried away forty (40) cows or animals of the cow kind, the personal property of D. S. Hagood, Jr., against the peace and dignity of the State of Alabama."

Appellant was convicted of cattle theft as charged in the indictment and was sentenced to eighteen (18) months in the penitentiary.

At arraignment and throughout the trial, appellant was represented by retained counsel, who represents him on this appeal. His plea was not guilty.

Appellant filed a motion for a continuance on September 14, 1973, and an amended motion on September 18, 1973, contending that he did not have sufficient time in which to get witnesses in support of a motion for a change of venue which he intended to file and, too, that he had employed a private detective to help locate one G. W. Pritchett who was a material witness to his defense. No ruling was invoked from the trial judge on this motion. However, appellant's case was not called for trial until April 24, 1974.

Appellant filed the following plea in abatement:

"STATE OF ALABAMA    IN THE CIRCUIT COURT
COUNTY OF LOWNDES    CASE NO. 384
"STATE OF ALABAMA    PLAINTIFF
                    VS.
ROSCOE C. HIGGINBOTH-  DEFENDANT
AM

## PLEA IN ABATEMENT

"Comes now the Defendant in the above-styled cause and appearing specially for the purpose of this Plea, and for no other purpose, and expressly limiting his appearance therefor, for answer to the indictment returned against him in this cause, says as follows:

"1. The Lowndes County Jury Commission, in making the Jury Roll and Jury Box from which the grand jurors who returned the indictment in this cause were drawn, made no good faith attempt to place on said Roll, and in said Jury Box, the names of all citizens of Lowndes County, Alabama, 'reputed to be honest and intelligent' and 'esteemed in the community for their integrity, good character and sound judgment', and not otherwise disqualified by law for jury service.

"2. The Lowndes County Jury Commission, in making the Jury Roll and Jury Box from which the grand jurors who returned the indictment in this cause were drawn did not make said jury Box and Jury Roll in substantial compliance with the requirements of the statutes of Alabama pertaining to the making of jury rolls and jury boxes.

"3. The Lowndes county Jury Commission, in making the Jury Box and Jury Roll from which the grand jurors who returned the indictment in this cause were drawn did not make a jury Roll and Jury Box which contained a reasonable cross section of citizens qualified for jury service in Lowndes County, Alabama.

"4. The Lowndes County Jury Commission, in making the Jury Roll and Jury Box from which the grand jurors who returned the indictment in this cause were drawn, did not use a fair and reasonably accurate method to determine the qualifications of citizens of Lowndes County for jury service.

"5. The Lowndes County Jury Commission, in making the Jury Roll and Jury Box from which the grand Jurors who returned the indictment in this cause were drawn, did not, in the preparation of said jury Roll and Jury Box, give an equal opportunity for selection for jury service to all citizens of Lowndes County, Alabama, who were qualified for jury service.

"6. The Jury Box from which the grand jurors who returned the indictment in this cause were drawn was regularly kept by the Lowndes County Jury Commission at a place other than that authorized by the Code of Alabama 1940, Title 30, Section 20, as amended.

"7. The Lowndes County Jury Commission, in making the Jury Roll and Jury Box from which the grand jurors who returned the indictment in this cause were drawn, prepared said Jury Roll and Jury Box at a time other than that when the Commission was vested with authority by the statutes of Alabama to make a Jury Roll and Jury Box.

"8. In the preparation of the Jury Roll and Jury Box from which the grand jurors who returned the indictment in this cause were drawn, the Lowndes County Jury Commission made no determination as to whether or not the persons under consideration for jury service were 'generally reputed to be honest and intelligent men . . . esteemed in the community for their integrity, good character and sound judgment.'

"9. The Jury Box and Jury Roll from which the grand jurors who returned the indictment in this cause were drawn,

were vitiated by fraud, in that, in the preparation of ·said Jury roll and Jury Box, the Lowndes County Jury Commission unlawfully, intentionally, systematically, arbitrarily, and fraudulently excluded from consideration for inclusion upon said Jury Roll and in said Jury Box approximately *sixty-five (65%)* percent of the registered electors of said County, and approximately *sixty-five (65%)* percent of the adult citizens listed in the telephone directory for municipalities located in said County.

"10. The Jury Roll and Jury Box from which the grand jurors who returned the indictment in this cause were drawn were not prepared between August 1, 1972 and December 20, 1972, as required by law.

"11. The Jury Box and Jury Roll from which the grand jurors who returned the indictment in this cause were drawn were vitiated by fraud, in that, in the preparation of said Jury Roll and Jury Box, the Lowndes County Jury Commission unlawfully, intentionally, arbitrarily, systematically and fraudulently excluded from consideration for · inclusion upon said Jury Roll and in said Jury Box approximately all citizens of Lowndes County, Alabama, qualified for jury service, who were not registered electors of said County, or who did not have telephones at their residences.

"12. The Jury Box and Jury Roll from which the grand jurors who returned the indictment in this cause were drawn were vitiated by fraud, in that, in the preparation of said Jury Roll and Jury Box, the Lowndes County Jury Commission unlawfully, intentionally, arbitrarily, systematically and fraudulently excluded from consideration for inclusion upon said Jury roll and in said Jury Box all, or approximately all, citizens, of Lowndes County, Alabama, who were qualified for jury service, who did not reside within the territorial limits of incorporated municipalities within said county.

"13. The Lowndes County Jury Commission, in making the Jury Roll and Jury Box from which the grand jurors who returned the indictment in this cause were drawn, unlawfully, intentionally, arbitrarily, systematically, and fraudulently excluded from the Jury Roll and Jury Box all persons, otherwise qualified for jury service, who had been listed upon the previous Jury Roll of Lowndes County, Alabama.

"14. The Lowndes County Jury Commission made the Jury Roll and Jury Box from which the grand jurors who returned the indictment in this cause were drawn at a time other than between August 1, 1972 and December 20, 1972, as required by law, and at a time when the names in the Lowndes County Jury Box were not exhausted or so far depleted that they would probably be exhausted at the next drawing of jurors, and at a time when the Jury Commission had not been ordered to empty and refill the Jury Box by a Judge of the Circuit Court or court of like jurisdiction.

"WHEREFORE, said Defendant says that the indictment returned against him in this action was not returned by a lawful grand jury, and, if he is put to trial upon the indictment returned in this cause, he will be deprived of his rights under the Constitutions of Alabama and of the United States and under the statutes of Alabama to be tried upon an indictment returned by a lawful grand jury, and he will be deprived of his rights under the Constitutions of Alabama and of the United States to due process of law, and to equal protection of the laws and said defendant thereupon prays that this Honorable Court enter judgment discharging him from further prosecution under said indictment.

"s/ George K. Williams
  GEORGE K. WILLIAMS, Attorney for Defendant
"s/ James C. Esco
  JAMES C. ESCO, Attorney for Defendant"

There was no *demand for a jury trial* on this plea and there was no *objection* to the plea in abatement being heard by the trial court. Considerable testimony on this plea was heard orally before the judge. No error intervened here. Slatton v. State, 49 Ala.App. 377, 272 So.2d 586; Singleton v. State, 288 Ala. 519, 262 So.2d 768.

The three jury commissioners of Lowndes County were called to testify by appellant.

Mr. Bruce Crook was on the jury commission from 1960 to 1966. At the time he testified in this case, he was the Tax Collector of Lowndes County. He said he was serving on the jury commission at the time a Federal suit was filed in Judge Frank M. Johnson, Jr.'s court against the Jury Commissioners of Lowndes County. Immediately after Judge Johnson issued an order directing the Jury Commission to empty and refill the jury box of that county, the Commission met and emptied the jury box and refilled it to capacity using every other name from the official voting list of Lowndes County. He further testified that an attorney from the Justice Department in Washington was present and aiding the Jury Commission in carrying out Judge Johnson's orders. He further testified that the jury box was filled in accordance with Judge Johnson's order which set forth the procedure to be followed in doing so.

Another commission member, Mr. James Staggers, Jr. testified that he was appointed in 1969 and was re-appointed in 1972. He testified that the first meeting he attended after being appointed in 1969 he was shown a copy of Judge Johnson's order and was told the order had been fully complied with; that the jury box had been completely emptied and that the county had been gone through thoroughly and all the names of the residents of Lowndes County had been put in the jury box and that was the only meeting he ever attended until the Jury Commission meeting three weeks ago —that is three weeks before the hearing on the plea in abatement.

Mr. G. P. McPhearson, Jr. testified that he was appointed on the Jury Commission in February, 1972, and was elected President within the last month before this hearing. He said the Commission met on October 11, 1973. He further testified that since he had been on the Commission the jury box had not been emptied and refilled and no new names had been added. Title 30, Section 23, Code of Alabama 1940, provides that the jury box is to be refilled whenever the names are exhausted or so near depleted that they will probably be exhausted at the next drawing.

In overruling and denying the plea in abatement, the trial judge entered the following order:

"STATE OF ALABAMA      IN THE CIRCUIT OF
        VS.            LOWNDES COUNTY,
ROSCOE C. HIGGINBOTH-    ALABAMA
   AM              CRIMINAL CASE NO.
"ORDER            384

"FINAL ORDER ON PLEA IN ABATEMENT

"This cause comes on to be heard on the plea in abatement heretofore filed by the Defendant, the Answer of the State to said plea, and the testimony taken orally before the Court. The Court finds that although all of the statues (sic) pertaining to the placing of names upon the Jury Roll and in the Jury Box of Lowndes County, Alabama were not complied with strictly, there was no fraud involved in compling (sic) the Jury Roll or filling the Jury Box. The Court finds further that the Jury Roll was complied and the Jury Box was filled pursuant to an Order of the United States District Court for the Middle District of Alabama dated February 7, 1966.

"That in complying with said Order the Jury Board of Lowndes County was aid (sic) and supervised by an Attorney from the office of the Attorney General

of the United States of America, who intervened in the said Federal Court case. That said Jury Roll and Jury Box were filled with his aid and consent, and the said case in the United States District Court for the Middle District of Alabama was thereafter closed; that the venire from which the Grand Jury in this cause was selected was drawn from the jury box as so filled.

"The Court takes Judicial knowledge of the fact that at said time the Jury Box was filled to physical capacity, and that it contained several thousand Jury cards. The Court further takes Judicial knowledge of the fact that when the Jury Venire was drawn from which the Grand Jury was selected in the above styled cause the Jury Box was still more than half full of jury cards containing the names of several thousand prospective jurors.

"This Court therefore, (finds) that (sic) has been no need to refill the Jury Box.

"Upon consideration of all of these facts the Court is of the opinion that the Defendant's said plea in Abatement should be denied.

"It is, therefore ORDERED AND ADJUDGED by the Court that the Defendant's said plea in Abatement be and the same hereby is denied.

"Done this 5th day of November, 1973

"s/ Arthur E. Gamble, Jr.
    Circuit Judge"

On his motion for change of venue appellant called only two witnesses in an attempt to show that appellant, a white man from North Alabama, could not get a fair and impartial trial in Lowndes County on a cattle theft case. Both said in their opinion he could get a fair trial.

The state then called six witnesses, two whites and four blacks, who testified that appellant could get a fair and impartial trial in Lowndes County.

The Court in denying appellant's motion for a change of venue entered the following order:

"FINAL ORDER ON MOTION FOR CHANGE OF VENUE

"This cause comes on to be heard on the application of the Defendant for a change of venue, the answer of the State to said application, the testimony for the Defendant and for the State taken orally before the court, and the argument of the Attorneys for the State and the Defendant. The Court finds from the testimony, even of the Defendant's witnesses, that the Defendant can obtain a fair trial in the Circuit Court of Lowndes County, Alabama, and no testimony appears to the contrary. Upon consideration of which, the Court is of the opinion that said application should be denied.

"It is, therefore ORDERED AND ADJUDGED BY THE COURT That the Defendant's said application for change of venue be and the same is hereby denied.

"Done this 5th day of November, 1973.

"s/Arthur E. Gamble, Jr.
    Circuit Judge"

Appellant then filed a motion to quash the venire and further testimony was taken. We will now deal with this testimony.

Mr. Bruce Crook, a former member of the Jury Commission, was again called to testify. He testified that he was a party to the Federal law suit involving the Jury Commission of Lowndes County in 1966; that the Commission met and carried out the order of Judge Johnson and was aided by an attorney from the Justice Department who worked with them four or five weeks. He further testified:

"No sir, but Federal Judge Frank Johnson told us that anybody that was over twenty-one years old was to just be put

in there. Anybody over twenty-one and older, to put them on there. And that's just exactly what we did, sir.

"Q. In other words, you put all of the registered voters in the County that you had knowledge of into the jury box?

"A. Anyone twenty-one years and older."

Mr. Jim Staggers, also a member of the Jury Commission, who was appointed in 1968 or 1969, and who was re-appointed and serving at the time of the motion to quash the venire, was called by appellant. His testimony was essentially the same as that given on the hearing of the plea in abatement. He testified that he was familiar with the provisions of law which requires the Jury Commission to empty and refill the jury box every two years and that they strictly complied with the Federal Court Order.

He further testified that the Jury Commission last met in July or August of 1973. From the record:

"Q. Are you now in the process of selecting a prospective jurors list to go in this new box?

"A. Yes we are.

"Q. Do you know the method that is being used to select those jurors?

"A. I do.

"Q. What is that, sir.

"A. We are using every source of names, that we can find in Lowndes County, to fill or rather to compile a master list as we were instructed to last year. We will put the names of everyone twenty-one years and older on this list of everyone that is legitimate to serve on the jury. From that master list we will fill the jury box in a manner that we have not yet arrived at, but it will be as fair and square a method as we have had. We have over 8,000 names now to put in that jury box.

"Q. I understand that, and I know that you are studying that, Mr. Staggers. You said a list of legitimate jurors or voters, is that by your own personal knowledge of these voters or how are you determining that?

"A. Well, we are to evaluate each precinct in the county, and talk to persons who have knowledge of individuals that live in this county, and we will remove anyone from the list who is not, according to the law, desirable jurors."

The motion to quash the jury venire was overruled.

Title 15, Section 285, Code of Alabama 1940, provides:

"No objection can be taken to an indictment, by plea in abatement or otherwise, on the ground that any member of the grand jury was not legally qualified, or that the grand jurors were not legally drawn or summoned, or on any other ground going to the formation of the grand jury, except that the jurors were not drawn in the presence of the officers designated by law; and neither this objection nor any other can be taken to the formation of a special grand jury summoned by the direction of the court."

■ There was no error on the part of the trial court in denying the plea in abatement. There was absolutely no evidence going to show that the jurors were not drawn in the presence of the officers designated by law.

■ Fraud required to quash a venire is the intentional omission from the jury roll and the jury box of names of large numbers of legally qualified citizens. In Shields v. State, 52 Ala.App. 690, 296 So. 2d 786, certiorari denied, 292 Ala. 749, 296 So.2d 793, this court said:

"The fraud required to quash the venire is the intentional omission from the jury roll of names of a large number of legally qualified citizens, and such intentional systematic exclusion must be shown."

The testimony on this issue in this case shows that the Jury Commission of Lowndes County in filling the jury box were acting under the direct orders of a Federal Court, aided and assisted by an attorney from the Department of Justice, Washington, D.C. This attorney, the jury commissioners, and the clerk of the commission, determined that the most feasible way to comply with the Federal Court Order was to use the list of registered voters in Lowndes County in making up the jury roll and filling the jury box. Had they failed to carry out the court order, there is little doubt that they would have been cited for contempt.

We are familiar with the provisions of Title 30, Section 24, Code of Alabama 1940, providing in pertinent part, " * * * The jury commission shall require the clerk of the commission to scan the registration lists, the lists returned to the tax assessor, any city directories, telephone directories and any and every other source of information from which he may obtain information, and to visit every precinct once a year to enable the jury commission to properly perform the duties required of it by this chapter. * * *"

The testimony of the jury commissioners in this case shows not only a lack of intentional or purposeful exclusion of all qualified citizens from jury duty, but on the contrary demonstrates a conscious and meritorious effort on their part to carry out the mandate of the Federal Court Order to put the names of all persons over the age of twenty-one years in the jury box.

We hold that no fraud was practiced by the jury commission in filling the jury box and there was no discrimination in compiling the master roll of qualified persons for jury duty in Lowndes County.

█ We now turn to the facts in the case with the statement that this is a bizarre case. For a better understanding of what this case is all about we think it well to allude to the background of some of the people who are involved and who allowed themselves to become involved in a scheme of cattle rustling.

The appellant, Roscoe G. Higginbotham, was the brother-in-law of one James D. Wise who was also under indictment for stealing the same cattle that brought about appellant's conviction. At the time of the crime appellant was unemployed and was living in Huntsville, Alabama. Wise also lived in Huntsville where he was employed in civilian work at the Redstone Arsenal. Wise was also engaged in raising cattle and horses on his farm near Pulaski, Tennessee.

Mr. Dan S. Hagood, Jr., lived with his wife at the Beechwood Farm about six miles from Hayneville, Lowndes County, Alabama. He was engaged in the business of raising beef cattle.

Both Wise and Hagood were officers in a Reserve unit and had known each other for more than ten years. During these years they became friends. In the Spring of 1973 Colonel Hagood invided Colonel Wise to visit his cattle ranch at Beechwood and look over his fine herd of beef cattle. Colonel Wise visited Beechwood and Colonel Hagood drove him around the ranch consisting of four pastures. Colonel Hagood had Brahma bulls, angus and herefords in all four pastures. Colonel Hagood's cattle were branded with a "lazy H" on the left hip.

On July 25, 1973, Colonel Hagood was on duty in Ft. Campbell, Kentucky. On that date Colonel Wise and appellant showed up at Beechwood and appellant was introduced to Mrs. Hagood as "Charlie Brown". There is some testimony in the record that "Charlie Brown" was appellant's nickname. They arrived at Beechwood around noon in a military car and Colonel Wise told Mrs. Hagood that they were passing through from Camden where they had gone to look at some equipment and he had told Charlie Brown that he had a friend that had some pretty

cattle and he wanted him to see them. Mrs. Hagood got in a pickup truck and drove to the four pastures to show Charlie Brown the cattle. They were at Beechwood about two hours and left as Charlie Brown had to get back to Montgomery and catch a plane to Huntsville.

On August 1, 1973, Colonel Wise came back to Beechwood arriving around 7:00 A.M. and asked Mrs. Hagood to go to Mobile with him and have supper. She agreed to go with him as she did not have anything to do and was lonely. They agreed to meet at the Holiday Inn in Greenville where Colonel Wise was to leave his car and drive her white Volkswagen to Mobile. At this time Colonel Hagood was still on military duty in Ft. Campbell. Mrs. Hagood packed a few things in an. overnight bag and followed Colonel Wise to Greenville where he put his bag in her car and drove to Mobile. They got to Mobile around 2:00 P.M. and checked into a motel after buying a sixpack of beer. Colonel Wise handled the registration and Mrs. Hagood did not know in what name they were registered. They stayed in the motel room until time to eat dinner. After dinner they returned to their room and spent the night together.

The next morning while Mrs. Hagood was getting dressed, Colonel Wise left the room to make a telephone call. He came back in a few minutes and said, "Hurry up. We have got to get out of here. There's been a big mistake." Mrs. Hagood asked him, "What?", and he said, "I sent Charlie Brown to pick up some cattle and he got in the wrong pasture. He got in Dan Hagood's pasture." Mrs. Hagood became greatly upset and did not say a word all the way back to Greenville. They arrived in Greenville around 9:30 A.M. and Colonel Wise got in his car and Mrs. Hagood drove to Montgomery.

Colonel Hagood testified that on August 1, 1973, while on military duty in Ft. Campbell, he got a long distance call from Hayneville, Alabama. In response to that call, he went to the Chief of Staff and advised him of the situation and he was released from duty and got to Hayneville Courthouse the night of August 2, 1973, where he met Chief Deputy Sheriff Meadows who had escorted a truckload of his cattle from North Alabama. · The truck was loaded with forty head of his cattle. *He testified that he had not sold these cattle to anyone.* The cattle had a white spot of paint on them but he positively identified them as his cattle. The cattle were carried to his farm and put in the pen for the night. He said the cattle had been subjected to a long distance hauling to Athens, Alabama, and back, and they were skinned, had lost weight, were nauseated from the fumes of the truck, and later one of them died.

On cross-examination he testified that Colonel Wise paid him for the dead cow and also paid him for the damage done to a brick wall. He further testified that after this incident he had a two-hour conversation with Colonel Wise.

Following this conversation, Colonel Hagood and Colonel Wise went to Greenville to confer with the District Attorney. The substance of the conversation with the District Attorney was that Colonel Wise and the defense attorneys were desirous of having the charges dropped against Mr. Higginbotham. Colonel Hagood said he did not request the charges be dropped and neither did he object to a dismissal of the charges. He asked the District Attorney to represent him in the case. He further testified *that at that time* whatever the District Attorney wanted to do was all right with him but since that time, other things had come to light and he did not want the charges dropped.

Now the plot thickens. Colonel Wise testified that around the first part of June, 1973, he met a man at a cattle sale barn in Scottsboro, Alabama, by the name of G. W. Pritchett. They got into a conversation concerning 200 head of cattle and 50 calves that Mr. Pritchett had for sale on

some land on Route 1, Camden, Alabama. Colonel Wise told Pritchett that he had three farms plus a leased farm near Pulaski, Tennessee, and mentioned the "Old Milky Way" farm in that area. Pritchett told him he was familiar with that entire area of Tennessee. Colonel Wise testified that the next time he heard from Pritchett was by telephone about the middle of June. In this telephone conversation Pritchett allegedly told Colonel Wise that there was a possibility that he was going to sell his farm in Camden and wanted him to see his cattle and see if he was interested in a good buy. Colonel Wise told Pritchett if it was a good buy he would be more than happy to purchase his cows.

The last week in June, Pritchett allegedly called Colonel Wise again and told him he had to sell his cattle not later than the 1st day of August, 1973, and get them off the farm. It was agreed that Colonel Wise would meet Pritchett at the Holiday Inn in Greenville and look at the cattle. According to Colonel Wise they drove toward Camden for thirty or forty minutes and stopped at a place where a man was waiting for them in a pickup truck. The man in the pickup truck was introduced by his first name only. They rode through the fields and counted about 150 head of cows and calves. They returned to Greenville and Colonel Wise asked the price of the cattle and Pritchett said, "I will contact you later and make the price then."

On the 11th day of July, 1973, Mr. Pritchett came to Colonel Wise's ranch near Pulaski and told him if he did not buy the herd now, he would have to sell them to someone else. They agreed on a price of $350.00 per cow and $375.00 for each cow with a calf. Mr. Pritchett wanted a down payment of $4,000.00 and Colonel Wise told him he would only make a down payment of $1,000.00 cash and pay the balance when the cattle were delivered to his ranch in good condition. This was agreed to and a purported receipt was then

and there executed in words and figures as follows:

"11 July 1973

Received from James D. Wise, this date, one thousand dollars ($1,000 xx) earnest money for one hundred fifty brood cows (150), fifty (50) calves located on the farm of G. W. Pritchett, Camden, Alabama. The purchase price will be $375.-00 each for fifty (50) cows, and $350.00 each for one hundred cows (100) after delivery to the Flying "N" Ranch, Route No. 1, Lynnville, Tenn. Pick up of the cattle to be arranged by James D. Wise prior to 2 August 1973.

"G. W. Pritchett (signed)

"Witness: Lane L. Lee"

Colonel Wise further testified that on July 25, 1973, he and appellant flew to Montgomery and he got a military sedan to go to the National Guard Armory in Camden to see about borrowing some equipment to be used during a summer encampment. No one was present at the armory so that trip proved fruitless. Colonel Wise then suggested to appellant that since they were already in the area that they should try to locate the field that Pritchett had showed him where the cattle that he had purchased were located, *but they were never able to find the field*. They stopped at a service station and asked several people if they knew Mr. G. W. Pritchett and were told they never heard of such a man. They then drove to the Hagood farm and asked Mrs. Hagood if she knew such a man and she said she did not know him. It was on this occasion that Mrs. Hagood drove Colonel Wise and appellant to see the Hagood herd of cattle.

Colonel Wise testified that the only reason that he stopped by the Hagood home was to inquire about Pritchett as he was beginning to feel that Pritchett was a fictitious person and that he had just lost some money.

Colonel Wise further testified that on July 31, 1973, he got a telephone call from Mr. Pritchett and when he was asked the substance of that conversation he replied:

"He asked me if I had the trucks, he said you know you only have one more day or else you will forfeit your $1,000. I said well I think we have the trucks, we will be ready to go and we will meet you at Greenville. And he said, well, since you are furnishing the trucks, I might as well be honest with you it will be closer to my place by coming through Beechwood. He said do you know where Dan Hagood's place is, and I said yes I believe I do I told you that I knew where his place was, and I said I'd like for you to meet me because I've got to pay for the milage (sic) on those trucks, and he agreed with me. He said he would meet the people there.

"Q. What time was he to meet the people there?

"A. Between 8:30 and 9:30.

"Q. On the first of August?

"A. Yes, sir.

"Q. And it was your understanding, that he would meet him there, and take them to the place where the cattle were?

"A. That's right."

Colonel Wise then called appellant to go and get these cattle on the first of August and appellant agreed to do so. Colonel Wise called appellant at 3:00 A.M. on August 1, 1973, and gave him the final instructions about getting the cattle.

From the record Colonel Wise testified:

"He answered the phone, and I said it's time to get up, you are to meet my man down at Beechwood in the field that we were last in, and pick up the cattle. Arrangements have been made to bring them back to Tennessee.

"Q. He was to meet your man, meaning Mr. Pritchett?

"A. That's right.

"Q. At Beechwood?

"A. Right, sir."

Colonel Wise denied that he carried Mrs. Hagood to Mobile and spent the night with her. He admitted that he stopped at the Hagood home on the morning of August 1, 1973, and asked her if she had seen any cattle trucks or any activity over in the old store area in Beechwood and she said she had not. He told her he guessed the trucks would soon be there and that he was going to Greenville and she said to wait a minute and she would lead him the back way to Greenville; that she put a bag and some clothes in her little car and he followed her to Greenville. He parked his car at the Holiday Inn, but Mrs. Hagood did not stop—she just waved and headed back toward the Interstate. He said he went to Mobile with a Mr. Swain and they spent the night in the same motel room.

Appellant testified that Colonel Wise, his brother-in-law, asked him to get men and trucks and haul the cattle that he had purchased below Hayneville. He said he was not familiar with South Alabama and Colonel Wise told him they would go down and he would show him the location of the cattle. They made the trip on July 25, 1973, and Colonel Wise showed him the cattle. When Colonel Wise called him at 3:00 A.M. on August 1, 1973, he told him to go down to the last field where he (appellant) had been—to go to the last pasture and arrangements had been made to pick up the cattle and that is all he remembered. He was asked if he found out later that that's "not what he intended to tell you?".

"A. Later, yes sir. After these events had taken place, I was informed that I was in the wrong pasture that I had been told. Mr. Wise informed me that he meant to tell me different, I don't remember hearing anything that I was to meet a man at this field."

Appellant further testified:

"I went on to Montgomery to see if the other fellow had gotten ahold of any more trucks, and see if I could find Mr. Wise. · He had given me the impression that he was supposed to be there already in Montgomery, trying to find us some more trucks to come down here to help us transport his cattle back. I went to Montgomery to try to find Mr. Wise to see if he had located some other trucks for us to use.

"Q. Did you locate him?

"A. No, sir."

On cross-examination, appellant testified:

"A. Mr. Wise told me that arrangements had been made to to get the cattle that he had bought. I was to go to the last pasture—to the last field to the last location that we had been in on the previous week. I knew where this was, we had spent sometime in that particular field.

"Q. Infact, (sic) you never found that farm down in Camden, did you?

"A. No, sir. We didn't find the farm.

"Q. And did you understand his directions thoroughly?

"A. Yes, sir.

"Q. Just exactly what did he tell you?

"A. As I said, he told me to go down to the last pasture that we were in, and he had already made arrangements to transport the cattle.

"Q. He said he had made arrangements to transport the cattle?

"A. He said arrangements had been made, yes, sir.

"Q. Did he say who made them?

"A. No, sir, he did not.

"Q. Did he say who the arrangements had been made with?

"A. No, sir.

"Q. Did he say whether arrangements had been made with Colonel Hagood or Mrs. Hagood to buy those cattle?

"A. That was the extent of what he said."

A careful review of this record clearly reflects that Colonel Wise had entered into a gigantic scheme to remove all the cattle from the Beechwood Farm in Lowndes County, Alabama, to his ranch near Pulaski, Tennessee, and enlisted everyone connected with the transportation of these cattle into the commission of a crime of theft.

When appellant left North Alabama with a truck and the men who brought horses to round up the cattle and put them in the catch pen so they could be loaded on the truck, he knew at that very moment that he was going to the Hagood farm at Beechwood in Lowndes County. According to the testimony, appellant and Colonel Wise had not been· able to locate the so-called farm of G. W. Pritchett near Camden, Wilcox County, Alabama, and appellant had, therefore, never seen the cattle that Colonel Wise claimed he bought from Mr. Pritchett by making a down payment of $1,000.00.

Appellant testified that Colonel Wise agreed to compensate him for his work in transporting these cattle from Lowndes County to his farm in Pulaski, Tennessee. Appellant was unemployed during this period of time.

On July 25, 1973, when appellant accompanied Colonel Wise to Camden they did not contact the police at Camden, nor the Sheriff of Wilcox County, nor anyone connected with the Cattlemen's Association, in an effort find our anything in connection with a man allegedly named "G. W. Pritchett". It was on this date that appellant and Colonel Wise stopped at Beechwood to look over the Hagood herd of fine beef cattle. Colonel Wise, in the presence of appellant, claims he asked Mrs. Hagood if she knew or had ever heard of a "G. W.

Pritchett" and she said she did not know such a man.

After appellant and Colonel Wise were indicted by the grand jury of Lowndes County for the theft of the Hagood cattle, Colonel Wise stated that he employed a private detective from Birmingham to try and find a man named "G. W. Pritchett" in the Camden, Alabama, area. The detective went in the Camden area and in the course of his investigation he learned that a man by that name had died two years previously.

During cross-examination appellant was asked the following question and gave the following answer:

"Q. Did Colonel Hagood or Mrs. Hagood give you permission to move these cattle?

"A. No, sir, they did not."

The state recalled Mrs. Hagood for rebuttal and she testified without contradiction as follows:

"Q. You are Mrs. Dan Hagood, Jr.?

"A. Right.

"Q. And you have testified previously in this trial?

"A. Yes, sir.

"Q. All right, now, take your memory back, please, to the 25th of July, 1973, when Col. Wise and his brother-in-law, Charlie Brown Higginbotham, came to your place?

"A. Yes, sir.

"Q. Did Col. Wise ask you for any information regarding a Mr. Pritchett?

"A. No, sir."

In sum, had appellant been able to have gotten several more cattle trucks for the transportation of these cattle on August 1, 1973, there would not have been a cow left in the pastures of Beechwood Farms in Lowndes County. He knew precisely that he was to go to the last pasture that he and Colonel Wise were in the week before (July 25, 1973) and to get the cattle from that pasture. He knew the cattle in that pasture belonged to the Hagoods—Beechwood Farms.

Appellant's major defense to the charge laid in the indictment is that the state failed to prove there was felonious taking and carrying away of the cattle from the Hagood farm since all the evidence shows that the taking was in broad daylight, was open and notorious, with no attempt to hide or conceal.

It is, of course, well recognized that felonious intent is a material ingredient of larceny. McMullen v. State, 53 Ala. 531; Ludlum v. State, 13 Ala.App. 278, 69 So. 255.

In Reed v. State, 32 Ala.App. 338, 27 So.2d 22, Judge Carr said:

"It is also a familiar law that there is a strong presumption of the absence of the element of felonious intent when the taking and conveyance of the property is without secrecy and there is no subsequent effort to conceal or hide it and no denial of the true facts relating to the asportation. Bonner v. State, 125 Ala. 49, 27 So. 783; McMullen v. State, supra.

*"This rule, however, only amounts to an evidential presumption which the jury should consider in determining the guilt or innocence of the accused.*

"The Supreme Court in the early case of McMullen v. State, supra, made this observation: 'We do not understand the author as asserting that larceny cannot be committed, when goods are openly taken from the possession of the owner, without force, or even without fraud; nor that because there is no secrecy at-

tending the taking and carrying away, but it is avowed without inquiry, the offense cannot be committed. If such was the law, the bolder and more reckless the criminal, the greater his chances of escaping conviction. Clandestinity and falsehood are usual attendants of larceny; but it is sometimes committed openly, and boldly avowed. A strong presumption arises, when the taking is open, and there is no subsequent attempt to conceal the property, and no denial but an avowal of the fact, that there is not a felonious intent, which ought to be repelled by clear and convincing evidence, before there is a verdict and judgment of conviction. * * * The rule is very clearly stated by Mr. Greenleaf, as we do not doubt it was intended by Dr. Wharton to be understood: "If the taking, though wrongful, be not fraudulent, it is not larceny, but is only a trespass; and ought to be so regarded by the jury, who alone are to find the intent, upon consideration of all the circumstances." ' See, also, Talbert v. State, 121 Ala. 33, 25 So. 690; Jackson v. State, 137 Ala. 96, 34 So. 609; Barnes v. State, 103 Ala. 44, 15 So. 901." (Emphasis supplied)

In Coates v. State, 36 Ala.App. 371, 56 So.2d 383, Presiding Judge Carr expressed the controlling principles of law in the following language:

"Since larceny is a criminal trespass on the right of possession, it is necessary that the taking should be without the consent of the possessor. The burden of proof of this essential element of the offense is on the prosecution.

" 'Whether the doing of an act, or series of acts, constitutes grand larceny, or petit larceny, is a question of law; whether such act or acts were committed by the accused is a question of fact.' Commander v. State, 28 Ala.App. 42, 178 So. 241, 243."

In May v. State, 30 Ala.App. 390, 6 So. 2d 521, Presiding Judge Bricken, in treating a similar type case, said:

"The essential and controlling element was the intent of the defendant in driving up and penning the cattle as aforesaid. If the defendant committed said act with a felonious intent to deprive the rightful owner of his property, the offense complained of is complete. If, on the other hand, his actions in driving up and penning the said cattle were innocent and free from any felonious intent, as he strenuously insisted, he was guilty of no wrong, hence should not have been convicted. The determination of this crucial point of decision rested with the jury, and from all the evidence adduced upon the trial the jury was under the duty to consider and decide this question.

"Able and earnest counsel for appellant have filed an excellent brief in his behalf wherein several insistences of error are presented and urged to secure a reversal of the judgment of conviction from which this appeal was taken. Each of said insistences has had our careful and attentive consideration, but in view of the undisputed testimony as to the facts in this case, i. e. the admitted entering upon the lands of Ganguet where a large number of his (Ganguet's) cattle were enclosed in a pasture, and the driving up and enclosing 17 head of the 60 or more cattle in the loading pen, which of course if this action of defendant was done with the felonious intent, as hereinabove discussed, the crime of grand larceny would have been complete in its every aspect. But the defendant insisted he had no such intent, and as we see it, in his effort to sustain such insistence, the trial court manifestly allowed him every latitude and permitted a wide scope of inquiry, hence if any technical ruling of the trial court was infected with error, such ruling, in our opinion,

could not have prejudicially affected the substantial rights of the accused. Turner v. State, 29 Ala.App. 13, 191 So. 392; Id., 238 Ala. 352, 191 So. 396; Muse v. State, 29 Ala.App. 271, 196 So. 148."

The evidence in this case is undisputed that neither Colonel Hagood or Mrs. Hagood had sold these cattle to appellant or to Colonel Wise. Neither of them had given anyone permission to remove a single cow from the Hagood farm.

The able and distinguished trial judge gave appellant wide latitude in developing testimony going to show that the taking of these cattle was open and notorious and there was no subsequent attempt to conceal the cows and that under such circumstances a strong presumption arises that there was no felonious intent which must be repelled by clear and convincing evidence before a conviction is authorized. Under these circumstances a jury question was presented and the jury resolved that issue against appellant. This the jury had a right to do.

The trial court orally charged the jury on all facets of the law applicable to cases of this kind. In addition he gave the jury fifteen written charges requested by appellant which were in many respects repetitious of the oral charge. At the conclusion of the oral charge appellant announced in open court that he was satisfied with the court's charge.

After the verdict was returned, the jury was polled and all the jurors announced it was their verdict.

We have carefully read, and re-read, the entire transcript and have found no errors injuriously affecting the substantial rights of appellant.

Accordingly, the judgment of conviction is affirmed.

Affirmed.

All the Judges concur.