[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 282 
Appellant was indicted by the Montgomery County Grand Jury on August 8, 1975, on three counts:
(1) Inciting to a felony, bribery;
(2) Inciting to a felony, attempted bribery;
(3) Accepting a bribe.
The State elected to go to the jury on Count I only, and appellant was found guilty thereon and sentenced to three years in the penitentiary. *Page 283 
 THE STATE'S CASE
A short synopsis of the evidence against the appellant is here set out in a light most favorable to the State. The appellant was the president of the Alabama Public Service Commission (hereinafter P.S.C.) from January 1973 to December 1975. Rex Moore and John Moore were majority stockholders in Tops Vending Machine Company (hereinafter Tops). During 1973 the Moores approached the appellant in order to solicit his help in securing the vending machine business in a South Central Bell Telephone Company (hereinafter Bell) plant on Adams Street in Montgomery. The Moores testified that the appellant then stated that he would have to receive $10,000.00 for his services. The Moores stated that they could not afford to pay that much.
In November 1974, Rex Moore received a telephone call from Mr. Vernon Lockard, an employee of Bell, about installing vending machines in the Adams Street plant. Rex Moore again met with the appellant at which time Moore said the appellant asked for $5,000.00 for his help in securing the vending machine business. Rex Moore replied that he could not afford to pay that amount. Subsequent to his conversation with the appellant, Rex Moore was informed by Mr. Lockard that Tops would not get the vending machine business at the Adams Street plant, however, in January of 1975, Mr. Lockard allowed Tops to install vending machines in that plant. The commission from the machines went to the Pioneer Club, an employee organization, not to Bell.
Charles Price was a Bell vice president in charge of public relations. Price had frequent contacts with the appellant and other members of the P.S.C. The appellant asked Price to help Tops get its vending machines into the Adams Street plant. Price complied with the appellant's request. In February 1975, subsequent to the installation of the vending machines, Bell filed with the P.S.C. a request for a rate increase of approximately $59 million. The final order concerning the rate increase was entered in September 1975 (after the arrest and indictment of the appellant). After the installation of the vending machines, Rex Moore said the appellant requested that the Moores pay him $300.00 per month for his help in placing the machines. The Moores refused, although they did give the appellant a total of $200.00 which he requested as expense money for two State business trips.
Some months after the machines were installed, the appellant contacted Price to have Tops' machines removed, stating that the Moores were "a bunch of crooks." The appellant said Price would not get what he needed unless the machines were removed. From that Price concluded that the appellant would not look favorably on the Bell request for a rate increase if the machines were not removed. At first Price did nothing, but appellant began to pressure him more and more to have the machines removed from the Bell plant. Price finally went to the Moores and told them to settle their problems with the appellant.
Rex Moore testified that because of incessant demands for money by the appellant and because of pressure from Price to settle with appellant, he informed the Attorney General of the circumstances involved in this case. Agents of the State had Rex Moore call appellant and arrange to meet in a local truck stop restaurant on July 8, 1975. Those agents wired Rex Moore with a transmitter and recorded his conversation with appellant. Based upon Moore's complaint and the recorded conversation, a warrant for appellant's arrest was issued on July 12, 1975, and on August 8, appellant was indicted by the grand jury. The recording was admitted into evidence and played for the jury during the trial.
 THE APPELLANT'S CASE
The appellant testified in his own defense. It was his contention that the Moores were the instigators of the whole affair. He said Rex Moore offered him money to help place Tops' machines in the Bell plant. Appellant denied ever asking the Moores for money or accepting money in connection with placing the machines in *Page 284 
the Bell plant. He steadfastly denied ever having implied to Price that he should put pressure on the Moores in turn for a Bell rate increase. The appellant argues at length in his brief that the Attorney General prosecuted him solely for political reasons. A number of witnesses testified as to appellant's good character.
 I
Since the State elected to go to the jury on Count I only, appellant's contention that one of the other two counts was improperly amended was thereby rendered moot. Only the count upon which appellant was found guilty is subject to appellate review.
 A.
Among numerous motions and pleadings, on November 10, 1975, appellant filed a motion to quash the indictment. One ground set out in the motion to quash was that the grand jury which returned the instant indictment, "was not in compliance with the requirements of the laws of the state of Alabama in obtaining the general cross-section of the community. . . ."
The State contends that the Montgomery County Jury Commission, acting under a federal court order, was required to fill the jury box by taking every fifth name from the voting list of Montgomery County. Appellant contends that such a system fails to fully comply with Alabama statutes on establishing jury lists. The testimony did establish that every fifth name was selected from a computer printout of the Montgomery County voters list.
In support of its position, the State cites Higginbotham v.State, 54 Ala. App. 633, 312 So.2d 31 (1975). In Higginbotham, the venire was established pursuant to a federal court order relating to the Lowndes County Jury Commission. There, the federal court required the commission to examine not only the voters list of that county, but also the tax assessor's list and the list compiled by the federal examiners, and make up a comprehensive list therefrom. The testimony in that case showed that the Lowndes County Jury Commission complied with the requirements of the federal court order and in addition thereto used every source of names available to them in Lowndes County in compiling the master list. The testimony showed that everyone twenty-one years and older was included on the list. The commission also evaluated each precinct in the county and talked to persons having knowledge of individuals living in the county for the purpose of removing ineligible persons as jurors according to the jury laws of this state.
In the instant case, the Montgomery County Jury Commission in following the federal court order ignored the state law. In the memorandum opinion issued in Penn et al. v. Eubanks et al., Judge Frank Johnson, Jr., on June 6, 1973, stated, "As for the means of selecting this cross-section, this court commends forthe jury commission's consideration the random jury selection plan used in all federal district courts and in many state courts. See Jury Selection and Service Act of 1968, 28 U.S.C. § 1861-1865." (Emphasis supplied.) That court's order stated that, "The jury commission shall examine the voting list and make an alphabetical list therefrom. . . ." That order did not go as far as the one issued in Higginbotham in allowing the use of other sources in selecting potential jurors.
Judge Johnson's order and opinion relating thereto, set a minimum standard which the Montgomery County Jury Commission must meet in order to comply with federal constitutional provisions. We do not read his order to mean that the jury commission is to completely ignore the statutory requirements of Alabama law in selecting and qualifying jurors. Alabama law, if administered in good faith, provides a much better cross-section of the community for jury selection than the federal system.
In Higginbotham, supra, the Lowndes County Jury Commission complied with both federal and state standards. In the instant case, the Montgomery County *Page 285 
Jury Commission meets only the minimum federal requirements and thus violates the requirements of Title 30, § 21, Code of Alabama 1940 as amended. However, the violation of a statutory requirement in filling the jury roll may not be taken advantage of by a motion to quash. Title 15, § 278 and Title 30, § 46, Code of Alabama 1940. The only exceptions to the prohibitions of these sections is in case of (1) denial of a constitutional right or (2) fraud.
In addition to the motion to quash the indictment, on October 30, 1975, appellant had filed a plea in abatement to the indictment. Ground 3 is as follows:
 "That the grand jury which returned the indictment against the defendant was not in compliance with the requirements of the laws of the state of Alabama in obtaining the general cross-section of the community, in that upon the information and belief, the venire from which the grand jury was drawn, was taken by a mere selection of each fifth name on the jury list[1]
of Montgomery County."
We must now determine if the question of fraud was properly presented in the trial court below and whether an erroneous ruling was made thereon by the trial court.
Gregg v. Maples, 286 Ala. 274, 239 So.2d 198 (1970) holds that a system of jury selection which excludes persons who are not registered voters would not substantially comply with statutory requirements that the jury roll contain the names of every citizen living in the county who are generally reputed to be honest, intelligent and esteemed in the community for integrity, good character and sound judgment. In the Gregg
case, the Alabama Supreme Court held that the method of selecting and compiling the jury roll in Madison County, making sole use of the voter registration list, is a fraud in law. To quote from Gregg:
 ". . . Fraud used in this sense has been construed as encompassing more than criminal wiles: `Fraud is a relative term, it includes all acts and omissions which involve a breach of legal duty injurious to others.' Inter-Ocean Cas. Co. v. Banks, supra [32 Ala. App. 225, 23 So.2d 874]. And it has been held that `When it affirmatively appears that the names of a large number of citizens who possess the qualifications required by law of jurors, are intentionally omitted from the jury roll * * * that is a fraud in law that requires the quashing of a venire * *. It is not the kind of a jury box contemplated by law. Our statutes do not contemplate * * * any system or scheme of selecting other than the selection of names authorized by law * * *.' 32 Ala. App. at p. 227, 23 So.2d at p. 875, citing Doss v. State, 220 Ala. 30, 123 So. 231."
In Fikes v. State, 263 Ala. 89, 81 So.2d 303 (1955), the appellant there filed a motion to quash the indictment on the ground of systematic exclusion. The Alabama Supreme Court set out at length the procedure used in Alabama for compiling jury lists. It went on to hold that "there is no legal reason for quashing an indictment or venire simply because the jury commission did not put the name of every qualified person on the roll or in the jury box, in the absence of fraud (or a denial of constitutional rights). . . ."
Fikes was cited by the appellee in Gregg v. Maples, supra, as justification for excluding persons not on the voters list. In the Gregg case, the Alabama Supreme Court pointed out thatFikes is a proper statement of the law, except that the appellee had ignored the phrase, "in the absence of fraud. . . ."
In Bell v. Terry, 213 Ala. 160, 104 So. 336 (1925), the Alabama Supreme Court held that the indictment in that case should not be quashed, except on a plea in abatement, sustained by proof that the grand jurors who found the indictment were not drawn *Page 286 
by an officer designated by law to draw the same, or that the jury commissioners fraudulently filled the jury box.
In Reese v. State, 228 Ala. 132, 152 So. 41 (1933), the Alabama Supreme Court held that under our procedural statute (Title 15, § 278, of the present Code), a motion to quash the indictment was not the proper method of presenting questions going to the formation of the grand jury. Such could only be raised by a plea in abatement.
In Thomas v. State, 277 Ala. 570, 173 So.2d 111 (1965), the Alabama Supreme Court held that a motion to quash is the proper way to challenge an indictment and trial venire on grounds of intentional racial discrimination. The Court stated:
 "Sections 278 and 285, Title 15, and § 46, Title 30, Code 1940, have been held to be procedural statutes, designed to prevent quashing of indictments or venires for mere irregularities and to obviate the resulting delays in the administration of justice. Those statutes do not deny to one charged with a crime the right to present for a determination the question of whether the rights guaranteed by the Fourteenth Amendment to the Constitution of the United States have been violated. Vernon v. State, 245 Ala. 633, 18 So.2d 388. . . ." (Emphasis supplied.)
Citing Bell v. Terry, supra, this Court in Mullins v. State,24 Ala. App. 78, 130 So. 527 (1930) stated:
 ". . . We conclude from the holding in this case that, notwithstanding sections 8630 and 8637, Code of 1923, fraud in filling the jury box may be taken advantage of either by motion to quash the venire or by plea in abatement to the indictment containing proper averments, supported by proof that the jury box was fraudulently filled. . . ."
Sections 8630 and 8637 are found in the present Code as Title 15, § 278 and Title 30, § 46, respectively.
In Spivey v. State, 172 Ala. 391, 56 So. 232 (1911), the Supreme Court of Alabama found that where the record affirmatively shows an error was committed by the trial court in the organization of the grand jury, which is fatal to the judgment, on an indictment found by such grand jury, an objection thereto may be taken by a motion in arrest of judgment and also by motion to quash. The Court in that case stated:
 ". . . The jury law has for a long time provided that no objection can be taken to any venire, except for fraud in the drawing or summoning; yet this objection could not be taken to an indictment, if the grand jury was drawn in the presence of and by the officers designated by law; that is, this question could not be inquired into on a plea in abatement, nor on motion to quash an indictment, if the grand jury was drawn in the presence of, and by the officers designated by law. . . ."
* * * * * *
 "In case the error is apparent of record, and is fatal, and goes to the organization of the grand jury which found and returned the bill, the objection is availing on motion in arrest of judgment, or by motion to quash; otherwise by plea in abatement. Ramsey v. State, 113 Ala. 49, 21 So. 209; Peters v. State, 98 Ala. 38, 13 So. 334."
In considering the applicability of Gregg v. Maples, supra, we make the following observations:
(1) Gregg v. Maples arose from a petition for writ of mandamus to reconstitute the jury roll, not from a motion to quash an indictment.
(2) The Montgomery Jury Commission was acting under federal court order stating that, "The jury commission shall examine the voting list and make an alphabetical list therefrom. . . ." (Emphasis supplied.)
(3) Failure to comply with the state statutes, detailing the composition of the jury roll, is not a denial of a constitutional privilege.
(4) As it relates to composition of grand juries, the fraud necessary to quash an indictment is construed by us to encompass *Page 287 
only willful and deliberate omissions of persons eligible to serve which would result in some demonstrable prejudice to the appellant.
To us there is a great difference between the body that merely accuses, via indictment, and the body that determines guilt or innocence. The requirements of due process and equal protection are more strictly observed in the trial phase (finding of guilt or innocence) than in the accusatory proceedings. For instance, in grand jury proceedings the accused has no right to be present, to confront witnesses, to cross-examine or to be represented by counsel, as he does at trial.
While grand juries and petit juries are drawn from the same jury lists, it is more important that an accused have the right to a much broader inquiry as to how the trial jury was selected than how his accusers were impaneled. There is no challenge to the petit jury composition on the grounds of fraud in the instant case. In light of Title 15, §§ 278, 285, we will not extend the rationale of Gregg. v. Maples, supra, to apply to the instant challenge of the grand jury. We hold to the rationale expressed in Higginbotham, supra. If the application of "fraud in law" as expressed in Gregg v. Maples, is extended to challenges of grand juries by motions to quash, it must be done by the Supreme Court, not by this Court.
Here, the appellant has failed to demonstrate how he was prejudiced by an indictment returned by a grand jury drawn from a list containing names of 6,070 voters of Montgomery County. Prejudice in jury selection (grand or petit) must be established by the appellant. Johnson v. State, Ala.Cr.App.,335 So.2d 663, cert. denied, Ala., 335 So.2d 678 (1976).
 B.
As to exclusion of nineteen and twenty year olds from the jury roll, we have previously disposed of that argument in favor of the State in Giddens v. State, Ala.Cr.App.,333 So.2d 615 (1976). Also see: Bowens v. State, 54 Ala. App. 491,309 So.2d 844 (1975).
 II
The appellant moved to exclude the State's evidence at trial, arguing that a fatal variance existed between the indictment and the proof produced. The appellant now contends the trial court erred to reversal in denying his motion to exclude. The indictment was, to say the least, complex. Count I of the indictment, upon which the verdict of guilty was based, was drawn by using a combination of two statutes, since no Code form existed for the specific offense charged.
Act No. 232, Acts of Alabama 1967, approved August 16, 1967 (Title 14, § 326 (a1)-(a4), Code of Alabama, 1973 Cumulative Pocket Part) establishes the crime of inciting to a felony. The specific felony which Count I alleges that the appellant incited is bribery (Title 14, § 63, Code of Alabama 1940). Count I charges:
 "The Grand Jury of Said County charge that, before the finding of this indictment, Kenneth Hammond, alias Ken Hammond, alias `Bozo' Hammond, whose true name is unknown otherwise than stated, did unlawfully incite, towit: John Moore, Rex Moore or Charles Price to a felony, towit: Bribery of an executive, legislative or judicial officer, in that the said Kenneth Hammond, alias Ken Hammond, alias `Bozo' Hammond, induced, procured or caused, or made an effort or endeavor to induce, procure or cause the said, towit: John Moore, Rex Moore, or Charles Price to corruptly offer, promise or give to an executive, legislative or judicial officer, towit: Kenneth Hammond, President, Public Service Commission, State of Alabama, after his election to said office, a gift, gratuity or thing of value, towit: money or proceeds from or in connection with operation of certain vending machines in, towit: South Central Bell Telephone Company buildings, Montgomery, Alabama, in the amount of, towit: $10,000 with the intent to influence the act, vote, opinion, decision or judgment on a cause, matter or proceeding *Page 288 
then pending or which may be by law brought before the said Kenneth Hammond in his official capacity as President, Public Service Commission, State of Alabama, towit: a telephone rate or charge increase required by South Central Bell Telephone Company styled, towit: South Central Bell Telephone Company, Petitioner: Petition For Approval of New Schedules Of Rates And Charges For Intrastate Telephone Service, Alabama Public Service Commission Docket 16966, contrary to law and against the peace and dignity of the State of Alabama."
The State drafted the indictment and is bound by its wording. It charges incitement to bribery by three alternatives alleged in the disjunctive. We summarize Count I of the indictment as charging that the appellant incited, Rex Moore, or John Moore,or Charles Price to:
(1) Corruptly offer, promise or give;
 (2) To appellant as an executive, legislative or judicial officer;
(3) A gift, gratuity, or thing of value;
(4) With intent to influence appellant's vote;
(5) On a pending Bell rate increase.
A major problem in testing Count I against the appellant's allegation of variance, is the use of the disjunctive, "or." When criminal conduct is alleged in an indictment in the disjunctive, we must view the proof against each disjunctive allegation separately.
We summarize the elements of bribery, enumerated in Title 14, § 63, as follows:
(1) To corruptly offer, promise or give;
 (2) To any executive, legislative or judicial officer;
(3) Any gift, gratuity, or thing of value;
 (4) With intent to influence his act, vote, opinion, decision or judgment;
 (5) On any cause, matter or proceeding then pending or which may be brought before such officer in his official capacity.
 A.
The first two alternatives of Count I are not sustained by the proof. Although the jury could reasonably find that appellant incited the Moores to offer him money, there is absolutely no proof that the offer was for the purpose of influencing appellant's vote on the Bell rate request. There was not one iota of evidence that the Moores had any interest whatsoever in the rate request. The Bell rate request was never mentioned in any conversation between appellant and the Moores. If Count I is sustained by the proof, it must be on the third alternative concerning Charles Price.
 B.
It is clear that Price acted on several occasions with the intent to influence appellant's official actions as such actions related to Bell's business. However, there is no evidence that Price was incited to pay any money to appellant. For Count I to stand as it relates to Price, the evidence must prove that appellant incited Price to give him, "any gift, gratuity or thing of value" in order to influence appellant's vote on the rate request. The question then is whether the doing of an act may constitute the giving of a thing of value, within the meaning of the bribery statute.
"A gift or gratuity will not support an indictment for soliciting or accepting a bribe unless the thing requested or accepted was something of value to the person seeking or obtaining it." However, the doing of an act which will ultimately result in a payment being made to the appellant is considered a thing of value in the law. Commonwealth v. Hayes,311 Mass. 21, 40 N.E.2d 27, 31 (1942); Commonwealth v. Hurley,311 Mass. 78, 40 N.E.2d 258 (1942).
12 Am.Jur.2d, Bribery, § 7, states:
 "It seems that a bribe must involve something of value that is used to influence action or nonaction. Value, though, is determined by the application of a subjective, rather than an objective, test, and the requirement of value is satisfied if *Page 289 
the thing has sufficient value in the mind of the person concerned so that his actions are influenced."
It was held in Ohio in Scott v. State, 107 Ohio St. 475,141 N.E. 19 (1923) that it is impossible to establish value which is universal, and further that, "the test of the value must necessarily be the desire of some person or persons, not necessarily of most persons or all persons, for the thing in question."
We held in McDonald v. State, 57 Ala. App. 529,329 So.2d 583, cert. quashed, Ala., 329 So.2d 596 (1975) that giving or promising to give sexual favors in exchange for official action was a sufficient thing of value to support a charge of bribery.
11 C.J.S., Bribery, § 2, p. 845, states:
 "In order to constitute the offense there must be the promise, gift, or acceptance of money or other thing of value, not necessarily of pecuniary or intrinsic value, but value in the sense of a personal advantage of some sort to be derived by the recipient." (Footnotes omitted.)
In Caruthers v. State, 74 Ala. 406 (1883), our Supreme Court held that the promise of a defendant to a juror to chop cotton for a week if the juror would clear him constituted a gratuity or a thing of value. The Court stated:
 "The substance of the offer or promise proved to have been made by the defendant to the juror, Bell, was that he would `chop cotton a week,' if the juror would clear or acquit him. This, in our opinion, was `a gift, gratuity, or thing of value,' within the meaning of the statute. The word thing does not necessarily mean a substance. In its more generic signification it includes an act, or action. So, the word gratuity embraces any recompense, or benefit of pecuniary value. . . . The evil of the offense is its tendency to pervert the administration of justice, by tempting jurors to act contrary to the known rules of honesty and integrity. The promise of the defendant to give his labor or services, as a reward for the corrupt violation of the juror's sworn duty, is a `gift, gratuity, or thing of value,' within the signification of the statute."
A similar explanation is found in Commonwealth v. Albert,310 Mass. 811, 40 N.E.2d 21, 26 (1942):
 "A promise to do an act that would result in a pecuniary gain to the defendant would undoubtedly come within the scope of the statute. . . . It is enough if a reward or personal advantage will accrue to the officer for the performance of the act and that he considers the value of that which he will receive so highly as to permit it to influence his official conduct. . . . Of course, if all the officer intended from the performance of the act was the self-satisfaction arising from the fact that he is empowered to command obedience or the sentiment that comes from conferring a kindness upon another, then he would not receive anything to which the law would attach value . . ."
If appellant, in ordering Price to have the machines removed, was acting out of revenge, or for the self-satisfaction he would receive by punishing the Moores for not meeting his earlier demands, then "he would not receive anything to which the law would attach value." However, the jury heard the witnesses and observed their demeanor. They listened to the testimony of the Moores, Price and of the appellant. "It could properly be found upon the evidence together with the inferences, which need not be necessary or unescapable so long as they were reasonable and warranted, that it had been proved beyond a reasonable doubt," that the appellant intended that his threat, transmitted through Price, would cause the Moores to give in and pay him money. Commonwealth v. Albert, supra. Price's action could thus be considered "a thing of value" to appellant.
 C.
Appellant contends that he is not an executive, legislative, or judicial officer within the meaning of the bribery statute and, therefore, could not legally be convicted *Page 290 
under Count I of the indictment. The Constitution of Alabama 1901 sets out the members of the executive, legislative and judicial departments, respectively in Article 5, § 112, Article 4, § 44 and Article 6, § 139, et seq. Neither the P.S.C., nor the position of president of the P.S.C. is listed in the above articles of the Constitution. However, the State contends that appellant comes within the purview of the bribery statute because, as president of the P.S.C., he performed executive, legislative and judicial functions.
We find no Alabama cases directly in point, however, we are persuaded by authority of cases from a number of other jurisdictions.
Most persuasive is Weil v. Black, 76 W. Va. 685, 86 S.E. 666
(1915). There, the Supreme Court of West Virginia, in interpreting a bribery statute similar to Alabama's held that a member of the Public Service Commission was a legislative or judicial officer within the meaning of that statute. The State quoted in its supplemental brief what we believe to be the heart of the reasoning expressed in Weil v. Black:
 "Members of the public service commission are included in the descriptive terms of the above statute `any executive or judicial officer.' Those are general terms, intended to include all public officers whose duties are either judicial or executive. The term `executive' is not there limited to the officers enumerated in section 1, art. 7, of the Constitution, as constituting the executive department of the state government, but it is designed to embrace all officers, whether elected or appointed, whose duties pertain to that branch of the government. Being public officers, whose jurisdiction extends over the whole state, it necessarily follows from the apportionment by the Constitution of all the powers of government among three departments, denominated therein as the legislative, the executive, and the judicial departments, that the duties of all public officials must fall within some one of those three departments. A fourth department, having powers distinct from the three named, could not constitutionally exist. That the public service commissioners are not included in the terms `members of the Legislature,' must be admitted; that they are included in one or the other of the terms `executive or judicial officers' we think is clear, and it is sufficient, for the purposes of this writ of error, to class them under the head of executive officers. If their duties are so varied that some of them may properly be classed as executive or ministerial, and others as judicial, they could, for purposes of the bribery statute, be classed under either of the two departments. In so far as they are empowered to investigate rates and charges of public service corporations, and to determine their reasonableness or unreasonableness, they would seem to be performing a quasi judicial function, while, in ascertaining what is a just rate for services to be rendered by such corporations, and prescribing such rate, as a rule to be obeyed in the future, their action would seem to partake somewhat of a legislative character; and in compelling obedience to its orders, by proper proceedings in court, as section 5 of the act creating it requires it to do, its duties are ministerial, coming clearly within the functions of the executive department of government."
We take judicial notice that there are scores of officers not listed in the Constitution under any one of the three branches of government. We do not construe this circumstance to have created a fourth branch of government. As stated in Peoples v.Salsbury, 134 Mich. 537, 544, 96 N.W. 936, 938 (1903):
 "The scheme of our government divides all governmental functions into three classes of powers, viz., the legislative, the executive, and the judicial; and the officers who perform these respective functions must be included in the three classes of officers who exercise these powers. It is difficult to conceive of an officer exercising any of the powers of government not being within one of these classes; and, when an officer cannot be classed *Page 291 
with the legislative or judicial, he must come within the executive class, for, in a sense, all officers execute the laws . . ."
Of similar import are: Davis v. State, 70 Tex.Crim. R.,158 S.W. 288 (1913); State v. Womack, 4 Wn. 19, 29 P. 939 (1892);Sheely v. People, 54 Colo. 136, 129 P. 201 (1913); State v.Emory, 55 Idaho 649, 46 P.2d 67 (1935).
While appellant, as president of the P.S.C., was certainly not a member of the legislature, he still performed legislative functions since rate making is such a function which could be exercised by the legislature or delegated by it to the P.S.C. See: Walker v. Alabama Public Service Commission, 292 Ala. 548,297 So.2d 370 (1974); Murray v. Service Transport, Inc.,254 Ala. 683, 49 So.2d 221 (1950); State v. Southern Bell Telephoneand Telegraph Company, 274 Ala. 288, 148 So.2d 229 (1962).
Although Article 5, § 112, does not list members of the P.S.C. as being members of the executive department, it could not be seriously argued that such officers do not perform duties normally associated with the executive branch of government. Therefore we find that appellant, as president of the P.S.C., was an executive, legislative or judicial officer within the meaning of our bribery statute, Title 14, § 63, supra.
Of the three alternatives charged in Count I, the State totally fails to prove two and barely proves the third. While the evidence at the trial may prove a series of highly questionable transactions between appellant, Price and the Moores, for the purpose of this appeal, such conduct can only be viewed in the context of the statute and the specific wording of the indictment. A complex and many-faceted count is the basis for depriving appellant of his liberty. We have been presented with a hodgepodge of facts and are told that upon one theory or another, they substantially prove every material allegation of the indictment. In order to find one theory or one alternative which would support the instant conviction, it has been necessary to fit facts together like connecting pieces of a complex jigsaw puzzle. When the task is completed, we find only one theory from which a jury could draw an inference of guilt. The evidence that appellant incited Price to bribe him, pursuant to the wording of Title 14, § 63, is far from overwhelming. Yet, we find it to be sufficient to meet the bare minimum standards to support the verdict of the jury.
 III
As one ground of his motion to quash the indictment, appellant complains that he was denied a fair trial due to prejudicial pretrial publicity. Appellant proved, through witnesses, that there was substantial pretrial publicity. He did not, however, prove that it prejudiced his right to a fair trial. The voir dire examination of the jury panel shows no prejudicial effect upon the jury resulted from the publicity. We find no error on the part of the trial court in its ruling against the appellant in this regard. Murphy v. Florida,421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Mathis v.State, 52 Ala. App. 668, 296 So.2d 755 (1973) cert. quashed292 Ala. 732, 296 So.2d 764; Gray v. State, 56 Ala. App. 131,319 So.2d 750 (1975); Yeomans v. State, 55 Ala. App. 160,314 So.2d 79 (1975).
 IV
Appellant contends that the trial court erred in refusing to grant his motion to produce certain evidence presented to the grand jury. He likewise contends that there was no legal evidence before the grand jury. The record reflects that Rex Moore and John Moore testified before the Grand Jury which indicted appellant. It has long been law in Alabama that where it appears that witnesses were examined before the grand jury, inquiry into the sufficiency of the evidence there presented is not permitted. Loyd v. State, 279 Ala. 447, 186 So.2d 731
(1966); Washington v. State, 63 Ala. 189 (1879). See also: State ex rel. Baxley v. Strawbridge, 52 Ala. App. 685,296 So.2d 779 (1974); Bowens v. State, 54 Ala. App. 491, 309 So.2d 844
(1974). We find no error in the trial court's refusal to open the *Page 292 
grand jury records to appellant. Thigpen v. State, 49 Ala. App. 233, 270 So.2d 666 (1972).
Neither was appellant denied a constitutional right when the State nol prossed the charges in the county court immediately prior to his preliminary hearing and then proceeded in circuit court by way of indictment. It has long been held that an accused has no absolute right to a preliminary hearing in Alabama after an indictment has been returned by the grand jury. Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999,26 L.Ed.2d 387 (1970); Campbell v. State, 278 Ala. 114, 176 So.2d 242
(1965); Johnson v. State, Ala.Cr.App., 335 So.2d 663 (1976) cert. denied Ala., 335 So.2d 678.
 V
The appellant contends that the trial court erred in admitting into evidence the tapes and transcripts of conversations between the appellant and Rex Moore. The tapes were obtained without a warrant, which the appellant contends violates the United States and Alabama Constitutions.
 A.
A review of the so-called "bugged agent" cases leads us to the inescapable conclusion that the lack of a warrant in this case did not violate the Fourth Amendment to the United States Constitution. On Lee v. United States, 343 U.S. 747,72 S.Ct. 967, 96 L.Ed. 1270 (1952); Lopez v. United States,373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); Osborn v. UnitedStates, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966);United States v. White, 401 U.S. 745, 91 S.Ct. 1122,28 L.Ed.2d 453 (1971). The above cases are also persuasive authority regarding the interpretation of the Alabama Constitution, but they are not binding.
Article 1, § 5, Constitution of Alabama 1901, reads as follows:
 "That the people shall be secure in their persons, houses, papers, and possessions from unreasonable seizure or searches, and that no warrants shall issue to search any place or to seize any person or thing without probable cause, supported by oath or affirmation."
Recently the Supreme Court of Michigan was faced with a case very similar to the case before us. There, a law enforcement officer, without a warrant, simultaneously monitored a conversation between a defendant and an informant. The defendant contended that the law enforcement officer's testimony concerning the conversation should have been excluded under the Michigan Constitution. The Michigan Supreme Court agreed and held that a search warrant should have been issued prior to the institution of the participant monitoring procedure. People v. Beavers, 393 Mich. 554, 227 N.W.2d 511
(1975).
Article 1, § 11, Constitution of Michigan 1963, which is almost identical to the aforementioned provision in the Alabama Constitution, reads as follows:
 "The persons, houses, papers, and possessions of every person shall be secure from unreasonable searches and seizures. No warrants to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. . . ."
While we express no opinion as to the efficacy of the above argument, we believe it is worthy of consideration. Especially noteworthy is the following statement from Beavers:
 "Participant monitoring is practiced extensively throughout the country and represents a vitally important investigative tool of law enforcement. Equally significant is the security and confidence enjoyed by our citizenry in knowing that the risk of intrusion by this type of electronic surveillance is subject to the constitutional protection against unreasonable searches and seizures. By interposing the search warrant requirement prior to engaging in participant monitoring, the risk that one's conversation is being intercepted is rightfully limited to circumstances involving a party whose conduct has provided probable cause to an independent magistrate to suspect such *Page 293 
party's involvement in illegal activity. The warrant requirement is not a burdensome formality designed to protect those who would engage in illegal activity, but, rather a procedure which guarantees a measure of privacy and personal security to all citizens. The interests of both society and the individual should not rest upon the exercise of the unerring judgment and self-restraint of law enforcement officials. Our laws must ensure that the ordinary, law-abiding citizen may continue to engage in private discourse, free to speak with the uninhibited spontaneity that is characteristic of our democratic society."
The State contends that a warrant is not required to surreptitiously record a conversation if one of the parties is a willing participant in the recordation procedure. The State cites Alonzo v. State ex rel. Booth, 283 Ala. 607,219 So.2d 858 (1969) as being dispositive of the issue. We do not agree.Alonzo appears to be clearly distinguishable on its facts. InAlonzo it was held that a warrant was not necessary in order for a private citizen to record telephone conversations in which he participated. In the present case, as in Beavers, supra, the police instigated, encouraged, and participated in the recording operation. Alonzo discloses no such police involvement.
The constitutionality of warrantless recording operations, which are instigated by law enforcement officers, must ultimately be based on public policy considerations. These policy considerations, which include numerous intangible factors, are adequately set out in On Lee, Lopez, Osborn,White, supra, and the vigorous dissents thereto. Also see: Amsterdam, "Perspectives on the Fourth Amendment," 58 Minn.L.Rev. 349 (1974); Kamisar, LaFave and Isreal, ModernCriminal Procedure, pp. 416-60. By the proceeding digression, we should not be construed to imply that the law enforcement agencies of Alabama have acted in any way inconsistent with the Alabama Constitution. We merely point out that the constitutionality of the use by the State of "bugged" agents, absent a warrant, has not been conclusively decided under the Alabama Constitution by our Supreme Court.
Based upon the federal decisions cited above, and based upon the very slight analogy Alonzo affords (see dissent, relying upon Lopez, supra) we find that no constitutional duty was breached by the failure of officers to obtain a warrant to tape record appellant's conversation with Rex Moore in the instant situation.
 B.
The electronic tape recording of the July 8, 1975, conversation between Rex Moore and appellant was introduced into evidence over vigorous objection, as was the stenographic transcript of the recording. That transcript was typed by a secretary in the Attorney General's Office under the direct supervision of one of the investigators who overheard the conversation as it was being recorded. It was authenticated by both. See: People v. Albert, 182 Cal.App.2d 729, 6 Cal.Rptr. 473
(1960).
Appellant contends the recording contained inaudible portions and that the typed transcript furnished by the State supplied words which were not audible on the tape. We have carefully listened to the recording and compared it to the State's transcript, and there are inaudible portions in the tape where words or phrases are supplied in the typed transcript. They are, however, minor in nature and served to only cast slight doubt upon the weight which should be given the recording by the jury. See: Tumminello v. State, 10 Md. App. 612, 272 A.2d 77
(1971).
Because the recorded conversation took place in a popular truck stop restaurant, the recording is replete with background noise of dishes clattering, customers and waitresses conversing, a baby crying, and the muffled roar of truck engines. Rex Moore's voice and his foul language come in loud and clear, as he had the microphone on his person. The appellant's voice is faintly heard for the most part, and altogether unheard in other parts. The tape recording is of poor quality and, without the Attorney General's transcript to follow as it is played, *Page 294 
the recording would shed very little light on the transaction, other than showing that Moore and appellant met and discussed something.
The question before us is whether admission of the recording and transcript violated any rules of evidence. We think not. First, the recording was played outside the presence of the jury for the circuit judge. Both sides had an opportunity, incamera, to point out objections to the recording or explain away ambiguities. Boulden v. State, 278 Ala. 437, 179 So.2d 20
(1965); Wright v. State, 38 Ala. App. 64, 79 So.2d 66 (1954). Secondly, the trial judge, after review, ruled the recording and transcript were admissible for whatever weight the jury wished to give them; a ruling which is subject to our limited review only as to abuse of discretion. Thirdly, the recording was not the only evidence offered, and other witnesses corroborated the substance of the conversation recorded.Wright, supra. Fourthly, the appellant testified that the recording was basically true and correct. We, therefore, find the recording and transcript thereof to be admissible for whatever weight they may have been accorded by the jury. Lykesv. State, 54 Ala. App. 7, 304 So.2d 249 (1974).
 VI
There was no exception or objection to the trial court's oral charge to the jury. The trial judge refused eleven written requested charges proposed by the appellant, and gave twenty-five. We have carefully examined each of the refused charges and find they were either affirmative in nature, and thus properly refused under the evidence, or were incorrect statements of applicable law, abstract in nature under the evidence, or fully and substantially covered in the given charges or in the court's oral charge. No error resulted in their refusal. Title 7, § 273, Code of Alabama 1940; Lebo v.State, 55 Ala. App. 624, 318 So.2d 319 (1975).
We have reviewed the record, consisting of six volumes containing 323 pages of pretrial testimony on motions and pleadings and 723 pages of testimony on the merits and trial court records. We have also examined the numerous exhibits accompanying the record. The appellant raised 58 issues in his original brief and reply brief which have been considered by this Court. After receipt of briefs, we directed that supplemental briefs be filed expanding on three crucial issues. Those issues have been addressed in this opinion along with certain other issues raised by appellant which merited serious consideration. Our review convinces us that, although many close questions of law arose, the trial court committed no error prejudicial to the appellant.
AFFIRMED.
All the Judges concur except HARRIS, J., concurs in the result only.
BOWEN, J., not sitting.
[1] "Jury list" as used in the plea in abatement is apparently a typographical or clerical error, since all the argument before the trial court and on appeal on this point refers to selection of every fifth name from the "voters list." All parties and the trial court treated the plea as an objection to selection from the voters list.