The appellant, Swannie Lee Davenport, was indicted for murder and first-degree hindering prosecution. She was convicted of the lesser-included offense of manslaughter, a violation of § 13A-6-3(a), Ala. Code 1975, and first-degree hindering prosecution, a violation of § 13A-10-43, Ala. Code 1975. The trial court sentenced her to serve consecutive terms of twenty years in prison on the manslaughter conviction and ten years in prison on the first-degree hindering prosecution conviction. The appellant filed a motion for a new trial, which the trial court summarily denied. This appeal followed.
The State presented evidence that the appellant was married to the victim, Lonnie Davenport; that Charlie Davenport *Page 29 
was their son; and that, around 3:35 p.m. on July 8, 2001, law enforcement authorities received a call about an accidental shooting at the Davenport residence. Johnny Floyd, who was working part-time with the Red Level Police Department, testified that he responded to the call;[1] that he arrived at the Davenport residence at 3:44 p.m. and saw the appellant and Charlie standing beside the house; that the appellant and Charlie were very calm, very collected, and not upset; that he got out of his vehicle, walked up to the house, and asked about the victim's location; that the appellant and Charlie told him that the victim was in the house; that, when he asked about what had happened, the appellant said, "`We were fighting and I shot him'"; that, when he went inside, he saw the victim on the living room floor; that the victim was not responsive; that he did not find a pulse; and that there was dried blood on the victim's body. (R. 309.) Michael Smith, a paramedic with the Andalusia Rescue Squad, testified that he arrived at the Davenport residence at 3:49 p.m.; that the victim had a wound to his chest and was not breathing; that there was not any electrical activity in the victim's heart, which indicated that the victim had been dead between thirty and forty-five minutes; and that the chest area of the victim's body was very cool, his neck region was bluish in color, his pupils were dilated, and he had dried blood on his body. Forensic testimony indicated that the victim died from a gunshot wound to the chest and that it was possible that the victim could have survived up to one hour after he was shot.
On July 9, 2001, the appellant made two audiotaped statements to law enforcement officers. In the first statement, she told law enforcement officers that, when she got home from work on the afternoon of July 8, 2001, the victim was angry and yelling; that she and Charlie had been arguing with the victim; that the victim went to their bedroom, and she thought that he might be going to get a gun; that, as the victim came back from the bedroom, he yelled, "`[Y]ou better shut up don't I'll, I'll kill you'"; that she did not know to whom the victim was speaking; that she got a gun because she did not know what the victim might do; that, when the victim came back into the living room, she pointed the gun at him; that the victim grabbed the gun, and it went off; and that the victim fell to the floor. (C.R. 440.) In her second tape-recorded statement, the appellant said that when she got home from work on the afternoon in question, Charlie met her outside and told her that he had shot the victim and that he and the victim had been arguing; that she and Charlie went inside, she made tea, they sat down, and they came up with a story about what had happened; and that, after they came up with a story, they telephoned 911.
The defense presented evidence that the victim was physically and verbally abusive toward the appellant and Charlie; that, on the afternoon of July 8, 2001, the victim was angry; that the victim had been arguing with the appellant and Charlie; that the victim had said, "`I'll kill you'"; that the victim went to his bedroom and got a gun; that the victim threatened to hit Charlie with the gun; that, subsequently, the appellant got a gun and pointed it at the victim; that the victim grabbed the gun and pulled it toward him; that the appellant and the victim struggled over the gun; and that the appellant accidentally *Page 30 
pulled the trigger, the gun went off, and the victim fell. (R. 839, 949, 976, 979.)
 I.
The appellant argues that the trial court erroneously denied her motion to suppress her two audiotaped statements to law enforcement officers. Specifically, she contends that the trial court should have suppressed those statements because she made them after she had requested an attorney and before she had the opportunity to speak to an attorney. The testimony presented during the suppression hearing and at trial indicated that, when law enforcement officers first arrived at the Davenport residence on the afternoon of July 8, 2001, the appellant told Floyd that she and the victim had been fighting and that she had shot the victim. Subsequently, law enforcement officers allowed the appellant and Charlie to wait at a neighbor's house while they were conducting their investigation; that, later that evening, Investigator Walter Inabinett of the Covington County Sheriff's Department went to the neighbor's house to talk to the appellant and Charlie; that both the appellant and Charlie invoked their right to counsel at that time; that Inabinett did not question the appellant and Charlie after they invoked their right to counsel; and that the appellant and Charlie were detained and taken to the county jail.
The State also presented evidence that the Covington County Sheriffs Department asked the Alabama Bureau of Investigation ("the ABI") for assistance in the investigation; that Agents Barry Tucker and Jay Solomon of the ABI came to Covington County to assist in the investigation; that, on the evening of July 9, 2001, the appellant was taken to a multi-purpose room in the county jail to be fingerprinted; that Tucker, Solomon, Inabinett, and Chief Investigator Dennis Meeks of the Covington County Sheriffs Department were present at that time; that the officers did not try to have a conversation with the appellant at that time; that, after the appellant was finger-printed, she looked at Tucker and asked about what was going to happen to her; that Tucker told her that, based on the evidence that they had at that time, she was going to be charged with murder; and that, at that time, the appellant said that she would tell them what had happened. Thereafter, the appellant made two audio-taped statements. The State presented evidence that, before the first statement, Solomon read a waiver of rights form to the appellant; that the appellant indicated that she understood her rights and signed the form; that no one applied violence to the appellant, made any promises to her, threatened her, told her it would be better for her to confess or make a statement, told her that it would be worse for her if she did not make a statement, or offered her anything to get her to make a statement; and that the appellant freely and voluntarily made the statement. Finally, the State presented evidence that the officers conducted a second interview with the appellant later that evening and that they reminded the appellant of her rights at the beginning of that interview.
"As we stated in Seawright v. State, 479 So.2d 1362,1366 (Ala.Crim.App. 1985):
 "`"[A]n accused . . . having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him unless the accused himself initiates further communication, exchanges or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378
(1981) (emphasis added [in Seawright]). See also Payne v. *Page 31 State, 424 So.2d 722 (Ala.Crim.App. 1982). As has been stated in this jurisdiction, "[a]ny person arrested who asserts his right to counsel may later change his mind and voluntarily submit to questioning." Morrison v. State, 398 So.2d 730, 743 (Ala.Crim.App. 1979), rev. on other grounds, 398 So.2d 751 (Ala. 1981) (citations omitted; see also Sates v. State, 432 So.2d 560
(Ala.Crim.App. 1983)).
 "`Most recently in Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Court clarified the Edwards rule and held that the State must prove (1) that the defendant initiated the dialogue with authorities, id.
at 1044, 103 S.Ct. at 2834, and (2) that the waiver of his right to counsel and to remain silent was knowingly and intelligently waived under the totality of the circumstances, id. at 1046, 103 S.Ct. at 2835.'
 ". . .
 "`[A]lthough the appellant had asserted his right to counsel and questioning had ceased, the evidence indicates that the appellant's statement was given voluntarily when he reinstigated discussion with the police officers. "Volunteered statements are not barred by Miranda. See Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966). `An unsolicited remark, not in response to any interrogation, does not fall within the Miranda rule.' Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr.App. 1985)." Jennings v. State, 588 So.2d 540, 543
(Ala.Cr.App. 1991). See also Fisher v. State, 587 So.2d 1027, 1038 (Ala.Cr.App. 1991), cert. denied, 587 So.2d 1039 (Ala. 1991), cert. denied, [503] U.S. [941], 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992), citing Smith v. State, 515 So.2d 149, 152
(Ala.CrApp. 1987). See also Bass v. State, 585 So.2d 225, 237 (Ala.Cr.App. 1991) ("[t]he evidence shows that the appellant's statements following his arrest were spontaneous and voluntary"); Whittlesey v. State, 586 So.2d 31, 33
(Ala.CrApp. 1991) ("[t]he statement was spontaneous and unsolicited and, therefore, was admissible. See Bedingfield v. State, 47 Ala.App. 677, 260 So.2d 408 (1972)").'
 "Sheely v. State, 629 So.2d 23, 29
(Ala.Crim.App. 1993)."
Flowers v. State, 799 So.2d 966, 985-87
(Ala.Crim.App. 1999).
The evidence presented in this case showed that the appellant was not questioned after she invoked her right to counsel and that law enforcement officers did not interview her again until after she initiated further conversation with them. Therefore, the trial court properly denied the appellant's motion to suppress the two audiotaped statements she made to law enforcement officers.
 II.
The appellant also argues that the trial court erroneously denied her motion to dismiss the indictment against her because it "failed to state a claim upon which relief may be granted under the laws of the State of Alabama." (Appellant's brief at p. 15.) Specifically, she contends that Count I does not state an offense because "[t]his Count charges [her] in part with murder for not seeking medical attention for [LonnellDavenport] after he had been shot" and because "the indictment fails to denote the legal duty enjoined by law on [her] part . . . to . . . protect the deceased from death or great bodily harm." (Appellant's brief at pp. 15-17.) Count I of the indictment alleged that the appellant *Page 32 
 "did intentionally cause the death of Lonnell Davenport by shooting him with a pistol and/or by not seeking medical attention for him after he had been shot, in violation of Title 13A-6-2 of the Code of Alabama, and as last amended, against the peace and dignity of the State of Alabama."
(C.R. 1.)
"A person commits the crime of murder if:
 "(1) With intent to cause the death of another person, he causes the death of that person or of another person. . . ."
§ 13A-6-2(a), Ala. Code 1975.
 "`An indictment which follows the language of a statute is sufficient to apprise the appellant of the charges against him, and to allow him to prepare a defense.' Copeland v. State, 455 So.2d 951, 956 (Ala.Cr.App.), cert. denied, 455 So.2d 956
(Ala. 1984) (citations omitted) (quoted in Garrison v. State, 521 So.2d 997, 1001
(Ala.Cr.App. 1986))."
McLemore v. State, 562 So.2d 639, 644
(Ala.Crim.App. 1989).
The indictment against the appellant substantially followed the language of § 13A-6-2(a)(1), Ala. Code 1975. Further, although Count I of the indictment alleged that the appellant had committed the offense of murder by not seeking medical treatment for the victim, it also alleged, in the alternative, that the appellant had caused the death of the victim by shooting him. Therefore, even if the portion of the indictment alleging that the appellant committed the offense of murder by not seeking medical treatment for the victim was defective, the remaining language of Count I adequately set forth sufficient facts to state an offense. Accordingly, the trial court properly denied the appellant's motion to dismiss Count I of the indictment.
Moreover, during its oral charge to the jury, the trial court did not instruct the jury that it could find the appellant guilty of murder on the basis that she did not seek medical treatment for the victim. Rather, it instructed the jury that it could find the appellant guilty of murder based on the theory that she shot the victim and based on a complicity theory. Therefore, the appellant's argument is also moot.
 III.
The appellant further argues that the trial court erroneously denied her motions for a judgment of acquittal at the close of the State's case and at the close of all of the evidence because the evidence did not support a conviction for murder. However, she was not convicted of murder. Rather, she was convicted of the lesser included offense of manslaughter.
 "`Only the count upon which appellant was found guilty is subject to appellate review.' DeFries v. State, 597 So.2d 742, 744 (Ala.Crim.App. 1992) (quoting Hammond v. State, 354 So.2d 280, 284
(Ala.Crim.App.), cert. quashed, 354 So.2d 294
(Ala. 1977), cert. denied 439 U.S. 823, 99 S.Ct. 91, 58 L.Ed.2d 115 (1978))."
Snell v. State, 677 So.2d 786, 791
(Ala.Crim.App. 1995). Therefore, the appellant's argument is moot.
For the above-stated reasons, we affirm the appellant's manslaughter conviction.
With regard to the appellant's conviction for hindering prosecution, Count II of the indictment alleged, in pertinent part, that the appellant
 "did render criminal assistance to Charles Christopher Davenport a/k/a Charlie Davenport by intentionally hindering the apprehension, prosecution, conviction, or punishment of Charles Christopher Davenport a/k/a Charlie Davenport for conduct constituting a *Page 33 
murder or Class A or Class B felony, towit: murder in that said [appellant] . . . falsely advis[ed] law enforcement that she was responsible for the shooting of Lonnell Davenport, in violation of Title 13A-10-43 of the Code of Alabama, 1975, and as last amended, against the peace and dignity of the State of Alabama."
(C.R. 1.)[2] The appellant was convicted of both manslaughter for the death of the victim and first-degree hindering prosecution based on the statements she made to law enforcement officers regarding the victim's death. This court addressed a similar situation in Goodwin v. State, 644 So.2d 1269,1272-1274 (Ala.Crim.App. 1993), as follows:
 "The appellants, Daren Goodwin and Dewey Goodwin were convicted of robbery in the first degree, § 13A-8-41, Code of Alabama 1975; conspiracy to commit robbery in the first degree, § 13A-4-3; and hindering prosecution in the first degree, § 13A-HM3. . . . They appeal their convictions, raising several issues.
 "The state's evidence tends to show the following. Dewey, Daren and William Sellers went to David King's house in Atlanta to speak to King about selling a stolen car in Alabama. King agreed to join them the next day and asked if his cousin Xavier Murray could go with them. The next day, Dewey, Daren, and Sellers picked King and Murray up in Atlanta. King and Murray, both from Atlanta, were asked to join in the plan because Deroy Butler, the target of their scheme, did not know them. Butler knew Daren and Dewey. The group planned to sell or pawn the stolen car to Butler and then take it back. They decided that Murray and King would approach Butler because in addition to not being known by Butler, they were juveniles.
 "After arriving in Alabama, the group went to Butler's store, which was closed. Sellers left the group at this time. The rest of the group went to the house of Patrick Goodwin. The five agreed that King and Murray would attempt to sell or to pawn the stolen car to Butler. Any money obtained was to be split six ways. They also agreed that, if Butler refused to buy or pawn the car, King and Murray were to tie Butler up, cut the telephone lines at his house, and take his money. Dewey and Daren gave King and Murray guns to take with them and showed them how to use them. Daren loaded and gave Murray a .32 caliber pistol. Dewey gave King a .22 caliber pistol and explained that the gun was not working properly because it would take only one round at a time. Patrick, Dewey, and Daren left King and Murray near Butler's house and waited nearby in their vehicle.
 "King and Murray walked to Butler's house and discovered that he was not at home. They were about to leave when Butler drove up in his truck. They spoke to Butler about the possibility of pawning a car. When Butler asked them where the car was, they told him that the car had ran out of gas and was parked nearby. Butler told them that they had the wrong man and asked them to leave. Butler then entered his house. At this point, King's testimony and Murray's testimony differ. King testified that, after Butler told them that they had the wrong man they walked back to the waiting car and got the guns. Murray *Page 34 
testified that they never left Butler's property, but had the guns in their possession from the beginning.
 "When Butler entered his house, he telephoned the sheriff's department and reported that something suspicious was going on at his residence. He was told that the only car the department had out that day was not nearby, but that someone would come to his house soon. Butler then called a neighbor and asked her to come over because he said he was worried about the two men in his yard. King and Murray were still waiting outside the house when the neighbor and her son-in-law arrived. The neighbors went into the house to check on Butler. King and Murray testified that Butler had a gun (possibly a 12-gauge shotgun) well within view of the front door and that they felt threatened by it. Butler himself testified that he had a shotgun and that it is possible that King and Murray saw him pick up the shotgun and place it behind the door.
 "At this point, either King or Murray started to walk back behind the house. Butler yelled for him to come back, saying that the sheriff was on his way. Both men returned to the front of the house. At the time, Butler's neighbor-was talking on the telephone with someone in the sheriff's department. Butler was then staring at a gun pointed at him through the storm door. King shot Butler three times and ran. Murray turned and ran when King fired the shots. King testified that he had seen Butler pick up his gun and that he shot Butler so he could escape. Butler denied ever having pointed a gun at anyone. Butler was hospitalized two days as a result of the bullet wounds, and the bullets were not removed from his body.
 "After Butler was shot, King and Murray ran down the road to find Dewey, Daren, and Patrick driving away. They hid in a cemetery while trying to decide what to do. The police later found the .22 caliber pistol in the cemetery and discovered that it was in fact defective in that it would take only one round at a time. They also found a mask and a cassette tape that were later determined to have had been left by King and Murray. King and Murray spent the night in a `hay stable.' The next day they stopped at a house and asked the resident which direction they should walk to get back on the highway to Atlanta. When they reached the highway, they began walking in the direction that they thought was taking them to Atlanta. A motorist who knew King stopped on the highway, told them they were walking in the wrong direction, and gave them a ride. They eventually went to Patrick's house where they found Dewey, Daren, and Patrick. Dewey and Daren asked them if they had gotten any money. Murray and King wanted to return to Atlanta. Because the police would be looking for them and they thought roadblocks might have been set up, Murray and King suggested that they should ride in the trunk of the car. Daren and Dewey drove them to Atlanta. They rode in the trunk, but after crossing the Georgia state line, they rode in the back seat. Patrick stayed in Alabama.
 "Shortly thereafter, King and Murray were arrested in Atlanta for their involvement in the shooting. While King and Murray were in jail, Dewey, who was also in jail at the time, attempted to have a letter delivered to them. Jail personnel intercepted the letter and it was entered into evidence at trial. The letter basically instructed King and Murray as to what they should say to the police. Dewey suggested in the letter that, if they would follow his instructions, *Page 35 
they would all stay out of trouble. He asked the juveniles to tell the police that they had been in their own car on the day of the shooting and that they shot Butler in self-defense. Dewey also promised to get them a good attorney if he was released. Dewey requested that they burn the letter after they finished reading it.
 "Dewey and Daren admitted at trial that they let King and Murray out of their automobile about one-half mile from Butler's house, but they claimed that they did not know what King and Murray were going to do. They also admitted knowing that the guns were in their car but they denied giving them to King and Murray. Dewey and Daren testified that they drove King and Murray to Atlanta, and that King and Murray rode part of the way in the trunk of their car.
 "Dewey and Daren contend that the state failed to present sufficient evidence to support their convictions for hindering prosecution. We agree. Dewey and Daren were convicted on an indictment charging that they `did, render criminal assistance to . . . King . . . and . . . Murray . . . by intentionally hindering the apprehension, prosecution, conviction or punishment of . . . King and . . . Murray . . . for conduct constituting . . . attempted Murder, in that [they] did, harbor or conceal [King and Murray] in violation of § 13A-10-43 of the Code of Alabama.' The prosecution's evidence shows that Dewey and Daren hid King and Murray in the trunk of their automobile on the trip back to Atlanta in order to avoid apprehension.
 "Section 13A-10-43(a) defines hindering prosecution in the first degree as follows:
 "`A person commits the crime of hindering prosecution in the first degree if with the intent to hinder the apprehension, prosecution, conviction or punishment of another for conduct constituting a murder or a Class A or B felony, he renders criminal assistance to such person.'
"Section 13A-10-42(1) and (3) provides that `a person renders "criminal assistance" to another if he . . . [h]arbors or conceals such person [or] [p]rovides such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension.' This statutory language was construed in Washington v. State, 562 So.2d 281
(Ala.Cr.App. 1990), where the court was confronted with the question of whether the defendant could plead guilty to the offense of hindering prosecution in the first degree as a lesser included offense of first degree robbery charged in the indictment. In holding, in essence, that as a matter of law, the offense of hindering prosecution is not a lesser included offense of the offense upon which the underlying prosecution could be based (specifically, in Washington robbery) the court stated:
 "`"The charge of hindering prosecution is inapplicable to a person charged as a principal. . . ."
 "`People v. Mercedes, 121 Misc.2d 419, 467 N.Y.S.2d 973, 974 (1983). . . .
 "`. . .
 "`Neither the statutory definition of hindering prosecution in the first degree, § 13A-10-43, nor the statutory definition of criminal assistance, § 13A-10-42, "states that a person may render criminal assistance to himself. If the legislature had so intended, it could have inserted that provision in the statute. Instead the legislature used the words `person' or `such person' throughout those sections and did not refer to the underlying *Page 36 
principal." Mercedes, 467 N.Y.S.2d at 974.
 "`"Moreover, if a defendant could be convicted of hindering his own prosecution, almost any defendant could be accused of rendering criminal assistance to himself. Thus a principal could be accused of harboring himself, warning himself or doing any of the other acts pro scribed by section [13A-10-43]. This is not a valid interpretation of the statute."
 "`Mercedes, 467 N.Y.S.2d at 975. See also Vickers v. State, 547 So.2d 1194
(Ala.Cr.App. 1989) (Refusing to aid a police officer is not a lesser included offense of escape. "This section is intended to apply, not to perpetrators of the offense. . . .").
 "`The history of the offense of hindering prosecution in Alabama shows that the offense has been limited to persons other than principals.
 "`"Under Alabama law the conduct described under § 13A-10-42 and prohibited by §§ 13A-10-43 and 13A-10-44 would ordinarily make one an `accessory after the fact' Former §§ 13-9-1 and 13-9-2. Former § 13-9-1 provided that all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid or abet in its commission, will be tried and punished as principals. Parsons v. State, 33 Ala.App. 309, 33 So.2d 164 (194[7]), established that participation in the crime may be proven by circumstantial evidence. Former § 13-9-2 dealt with accessories after the fact and provided any person, other than parent, child, brother, sister, husband or wife of the offender, who gives aid to the offender with the intent to enable him to avoid or escape from arrest, trial, conviction, or punishment in connection with a felony may be imprisoned in county jail up to six months and/or fined up to $1,000.00."
 `"Commentary to §§ [13A-10-42] through 13A-10-[44] (emphasis added I in Washington]). "Although Section 13-9-1 has been repealed, there is — for purposes of indictment and trial — still no distinction between principals and accessories under Alabama law." Lewis v. State, 469 So.2d 1291, 1297 (Ala.Cr.App. 1984), aff'd, 469 So.2d 1301
(Ala. 1985).'
"562 So.2d at 282-83.
 "In applying the above rationale to the instant facts, we conclude that the indictments of Dewey and Daren for the offense of hindering prosecution in the first degree was improper. While it is true that the indictment charged them with hindering the prosecution of King and Murray for the underlying offense of attempted murder, the attempted murder charge arose out of the same facts supporting the prosecution of Dewey and Daren for first degree robbery and for conspiracy to commit first degree robbery. To convict them of hindering the prosecution of King and Murray under these circumstances would, in essence, be convicting them of hindering their own prosecution, which is prohibited by Washington, Thus, this conviction must be reversed and the case remanded."
In this case, the appellant was convicted of manslaughter for the death of the victim. Because the hindering prosecution charge arose from the same facts as those supporting the manslaughter conviction, she could not properly be convicted of both manslaughter and first-degree hindering prosecution. Therefore, the trial court did *Page 37 
not have jurisdiction to enter judgments on both the manslaughter charge and the first-degree hindering prosecution charge. Accordingly, we remand this case to the trial court with instructions that that court set aside the appellant's conviction and sentence for first-degree hindering prosecution. On remand, the trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 28 days after the release of this opinion.[3]
AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.*
McMILLAN, P.J., and COBB and WISE, JJ., concur; SHAW, J., concurs in the result.
[1] Because Floyd was not available at the time of the appellant's trial, his testimony from a previous proceeding was read into evidence.
[2] The indictment also alleged that the appellant had committed the offense of first-degree hindering prosecution by not seeking medical attention for the victim after he was shot. However, the trial court did not include that language in its oral charge to the jury.
[3] Based on our disposition of the appellant's hindering prosecution conviction, we pretermit discussion of the appellant's arguments concerning that conviction.
* Note from the reporter of decisions: On February 17, 2006, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On March 10, 2006, that court denied rehearing, without opinion. *Page 520